# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 29, 2008 Session

## STATE OF TENNESSEE v. BRUCE WARREN SCARBOROUGH

**Direct Appeal from the Criminal Court for Knox County**
**No. 82497     Mary Beth Leibowitz, Judge**

---

**No. E2007-01856-CCA-R3-CD - Filed March 17, 2009**

---

The defendant, Bruce Warren Scarborough, was convicted by a Knox County Criminal Court jury of two counts of aggravated rape, Class A felonies, and was sentenced to consecutive terms of sixty years as a career offender in the Department of Correction.  On appeal, he argues that the trial court erred in (1) denying his motion to suppress the in-court and out-of-court identifications of him and his tattoos, (2) failing to grant a new trial due to prosecutorial misconduct during closing argument, (3) classifying him as a career offender, and (4) ordering consecutive sentences.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which JERRY L. SMITH and NORMA MCGEE OGLE, JJ., joined.

Mark E. Stephens, District Public Defender, and John Halstead, Assistant Public Defender, for the appellant, Bruce Warren Scarborough.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel West Harmon, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Allen and Leslie Nassios, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case involves the June 1997 vaginal and anal raping of the victim, K. R., for which the defendant was charged in August 2005 by presentment[1] with two counts of aggravated rape.

The trial was conducted on November 13-15, 2006.  At the trial, the victim testified that in 1997 she lived alone at 4601 Bob White Road in Knoxville.  She recalled that sometime that spring

---

[1]The State elected to proceed under a superseding presentment on November 13, 2006.

she began experiencing "kind of a creepy feeling. I thought perhaps I was being watched." She remembered an incident one evening approximately seven to ten days before the rape when she was napping on the sofa and "woke with a start and . . . saw a flash of what looked like a white t-shirt across the living room window." The victim stated that she told her mother that she needed "some sort of protection" and was considering buying a baseball bat, although she never did.

The victim testified that on June 3, 1997, she was at home with "a horrible case of laryngitis" and a friend brought her some cold medication around 4:30 p.m. The victim recalled that "[i]t did not register with [her]" that she did not lock the door when her friend left. The victim stated that during the night she was awakened by the sound of the door closing and heard footsteps on the hardwood floor. The victim remembered that she looked at the clock and it was around 3:30 a.m., and then she saw a figure standing in the doorway. The victim stated that with the hallway and living room lights on, the lighting was behind the figure. She recalled that the figure filled the majority of the doorway.

The victim testified that she "bolted upright and with laryngitis was screaming, 'Who are you?'" She recalled that the figure "rushed" at her, leapt onto her legs and torso, and used his arms to restrain her. She said she struggled and tried to scream while trying to make sense of what was happening. The victim stated she realized what was happening when the man began to rip off her clothes. She noted that he smelled "[v]ery strongly of greasy body odor" and that there was nothing familiar about him.

The victim testified that the man told her to hold still and not scream while he covered her eyes with his hand. She stated that the man pulled a piece of tape off his upper arm and used it to cover her face. She remembered that the man told her that he had a knife, that he would use it, and that he would cut her up. The victim testified that she then heard a rustle and felt the man touch her with plastic on his hands. She said that while he was touching her, he said, "I'm going to get you. . . . You just hold still. You're going to like this." She noted that the more she tried to pull away from him, "the more excited he got and the harder he would rape [her]."

The victim testified that shortly after the man began raping her, he took a pillowcase off one of her pillows, put it over her head, and "noosed it really tightly." The victim recalled that she lied and told the man she had herpes in an effort to disgust him and also tried to make herself vomit. She said she began to pray aloud. The victim said that she went limp and did not fight him, which "wasn't as pleasing. So, he turned [her] over and began to sodomize [her]." She said that the man grabbed some Ruhl Gel, an "anti-itch, bug bite" medication, from her bedside table and rubbed it on her vagina. She noted that she did not know she could feel pain "quite like that." The victim stated that sometime prior to the man raping her, he tried to kiss her and "said something about wanting oral sex," but she refused. The victim estimated that the initial rape lasted twenty-five to thirty minutes and that she was sodomized twice. She recalled that the man did not wear a condom.

The victim testified that she was able to make out the man's figure, shape of his haircut, his hair, and moustache as he was running toward her bed. She recalled that toward the end of the

attack, while she was being sodomized, the tape came off her eyes under the pillowcase and she was able to see tattoos on the man's arms. The victim said that she focused on the man's arms "for a minute and a half to two minutes," knowing she needed to be able to identify him if she survived. She stated that she looked behind her at the man's face through a gape in the pillowcase. She said she observed his eyes, eyebrows, cheekbones, and moustache for "[p]robably half a minute." She said that she noticed he was wearing a blue button-down shirt, a velcro-banded watch with a black band and blue trim around the edges and that she got an overall feel for his weight and age.

The victim testified that after the rape, the man put his pants back on as she lay naked "in the fetal position on [her] bed." She remembered that the man pulled her up, grabbed the back of the pillowcase tightly, and walked her down the hallway to the bathroom. She stated that he made her get into the shower with the pillowcase still over her head, poured liquid soap onto her hand, and told her "to clean that pussy real good. He didn't want nobody to find nothing. To clean it real good." She recalled that as she was washing herself, the man told her that he would be watching her house for a few weeks and if he saw any police cars he would come back and kill her. The victim said she washed herself for five to ten seconds and then became aware that the man was gone. She stated that she heard footsteps across the living room floor and the glass front door close and that she turned off the water and listened for a car but never heard a car start.

The victim testified that she retrieved a telephone from her bedroom and locked herself in the bathroom. She said she called 9-1-1 and reported that a stranger had entered her house and raped her. She recalled that officers arrived on the scene in "[j]ust a matter of minutes" and began securing the scene. The victim said she was taken by ambulance to the hospital where a rape kit was conducted. She said she went to the police station later that morning and gave a statement. The victim stated that she worked with an officer to create a composite of her attacker and that she drew a freehand representation of her attacker's tattoos. She said that she drew the overall image of the tattoo on her attacker's left arm, including the shape, coloration, and pattern but that she did not know what it was specifically. At this point in the victim's testimony, the defendant was asked to show the victim his arms, and she identified his tattoos as those of her attacker.

The victim testified that she looked through books containing photographs of convicted criminals and photographs of tattoos. She said she viewed photographic lineups containing six or eight photographs each "[a]t least a dozen" times. The victim stated that she viewed hundreds of photographs and that she was very concerned that she not wrongly identify her attacker. The victim testified that in 2002 she received a call from Detective Ed Stair with the Knoxville Police Department at her new home in Macon, Georgia, asking her to come to Knoxville because they had a potential suspect in her case. The victim said that when she arrived at the police station, she saw six standard computer paper sized photographs on a desk and that the first photograph she looked at was the one she recognized as her attacker. The victim said that she looked through the other photographs to be sure she was not having some sort of "unusual reaction" but that she was "100 percent certain" the man in the first photograph was her attacker. She recalled that Detective Stair asked her to look through a stack of photographs of tattoos and that she "became almost hysterically insistent" that the tattoos belonged to her attacker. She noted that once she recognized the tattoos,

Detective Stair told her the tattoos belonged to the man she had identified in the photograph. Asked how she knew she was not mistaken, the victim replied:

> There are a few defining moments in your life. Some of them joyful . . . . This was a defining moment. With every bit of comprehension and power I had, I memorized who had hurt me because I knew this person had done it before. He came too prepared. And I knew this person would do it again. And I felt the one thing I could do is keep another person from being hurt, should I ever be given an opportunity to identify this person.

The victim identified the defendant in court as the man who raped her.

On cross-examination, the victim acknowledged that when her attacker initially appeared in her doorway all she saw was a shadow and then got an image of his hair and moustache when he ran toward her. The victim also acknowledged that her drawing of her attacker's left arm tattoo did not contain a peacock although the defendant's tattoo did. The victim explained, however, that "[she] was going for pattern." She admitted she did not recall the tattoo having color in it. She agreed that she did not note that the tattoo on her attacker's right wrist contained a skull and a dragon.

On further cross-examination, the victim admitted that the five other men in the 2002 photographic lineup had different hair than the man she identified as her attacker. She said that they had "similarity either in cheekbone structure, the eyebrow structure, or general shape of the eyes." She acknowledged that one of the men in the photographs was heavier than the range she had given for weight and that one was an "older gentleman." On redirect examination, the victim stated that the drawings of her attacker's tattoos represented "[w]hat [she] could focus in on and see," not necessarily what he had.

Lieutenant Warren Hamlin with the Knoxville Police Department testified that he was one of the officers who responded to the victim's 9-1-1 call around 5:00 a.m. on June 4, 2007. Lieutenant Hamlin said that while en route, they looked for anyone matching the description of "a white male, [wearing] blue jeans and a paisley shirt with tat[t]oos on his arms" but did not see anyone. Lieutenant Hamlin stated that when they arrived on the scene, the victim was very scared, frightened, and hesitant to let them inside. Lieutenant Hamlin recalled that once inside, they searched the house and obtained more information from the victim before she was transported to the hospital by ambulance. He remembered that Investigator Mike Hyde from the major crimes division and Specialist Art Bohanan from the crime lab responded to collect evidence. Lieutenant Hamlin noted that both men had since retired. Hamlin read Bohanan's forensic report, which the parties stipulated would have been Bohanan's testimony had he been present at trial. The report was as follows:

> This document is dated 4 June of 1997, to Investigator M. Hyde from P.S. 3 Arthur Bohanan regarding 1064 of [the victim].

Number 97018517. The first paragraph, called in from home at 05:20. Arrived on scene . . . at 06:05 meeting Sergeant Hamlin and Officer Rotmeyer at the scene. Victim had already gone to Fort Sanders Hospital. Made photos of the house, the bedroom, the bath area. Rough sketch made of the entire house. Point of entry was through unlocked front door. Collected clothing and bedding from the bed. A tube of Ruhl Gel was taken from the nightstand. Also a bottle of body lotion from the side rail of the bed. Both had been used on the victim, according to officers.

Sergeant Hamlin said the victim stated the suspect had plastic bags over the hands. The front door, storm door, door frame to the bedroom and bath all fingerprinted. Finding only two useable latents. These from the inside of the storm door. Possibly made by responding officers.

House secured by Officer Rotmeyer, who gave me the keys to take to the victim at Fort Sanders. Her car in the driveway had been entered from the front passenger's side. This is a red Volvo . . . . A print of the door, a small box, a McDonald's cup, eyeglasses, cards and items in the floorboard. Glove marks found. Phone was still in the glove box. Completed at the scene at 06:50.

Went to hospital, received a rape kit from the box at 07:05. No presence of sperm [was] seen from examination. Talked briefly to victim and her parents. Gave her the keys. She was to come to CID with her mother. Left there at 07:15. 07:30, came back to CID. Conferred with Hyde. Composite sketch will be made before he took a statement. 07:40, the victim arrived with mother. Made composite sketch and she made sketches of the tat[t]oos on both arms of suspect.

The top page two, and the case number 97018517. Printed both items from the scene, finding no latents. Officer Tammy Hamlin brought a small blue table lamp back from the scene that had been touched. No useable latents developed, but could see where it had been touched. A glove like print. The two latents from the front door were searched through AFIS twice, finding no match.

15:00 asked to compare known prints of Michael Lett to latents from door. No match. Items confiscated as evidence: all were on the bed or nightstand. One white bed cover, one blue electric blanket, one green blanket, one pair of shorts bottom white with flowers, matching top recovered in the bathroom. One pair of blue

pants, one pillow cover, one blue/green checked dress, one tube of
Ruhl Gel (insect bite), one bottle body lotion, one rape evidence kit
from Fort Sanders Hospital. And [initialed] by Art Bohanan

Lieutenant Hamlin testified that the two latent prints lifted from the victim's door were examined and were determined to belong to the victim. Lieutenant Hamlin stated that the police now knew the defendant lived approximately six-tenths of a mile from the victim's house at the time of the rape. On cross-examination, Lieutenant Hamlin acknowledged that whoever committed the crime could have gone in a number of directions after leaving the victim's house and that the only thing they knew was that the victim thought that the suspect left on foot.

Barbara Morrison testified that in June 1997 she was working as a nurse in the emergency department at Fort Sanders Hospital, where she treated the victim after the rape. She said the hospital's standard procedure was to collect a rape kit when someone alleged to have been sexually assaulted. She testified that a completed rape kit is sealed, dated, and placed in a lockbox until the police pick it up. Upon seeing the victim in court, Morrison said that "[h]er face looks a little familiar."

Detective Ed Stair testified that he had retired from police work but had been working with the Knoxville Police Department's cold case division in 2002 when he started reviewing the victim's rape case. Detective Stair recalled that after he developed the defendant as a suspect, he obtained a warrant to secure a blood sample from the defendant. Detective Stair said that he photographed the defendant's tattoos. Detective Stair stated that he witnessed blood being drawn from the defendant and hair samples collected from the defendant. Detective Stair said that he delivered the blood and hair samples to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for genetic profiling.

Detective Stair testified that he located the victim, who was living in Macon, Georgia, in July 2002, and asked her to come to the Knoxville Police Department to view a photographic lineup. Detective Stair said he obtained six driver's license photographs from the Tennessee Department of Safety, which he assembled for the victim's viewing. Detective Stair recalled that he assembled the photographs on a table in the police department, three on top and three on bottom, and had them arranged before the victim arrived. Detective Stair remembered that the victim picked out the defendant's photograph within a couple of seconds and that he had her write the date, time, and her initials on the back of that photograph. Detective Stair said that he had the victim look at photographs of the tattoos on the defendant's arms and that she identified "a couple of them being the ones that she had seen on [her attacker's] arms." On cross-examination, Detective Stair acknowledged that he did not have the victim view the photographs sequentially.

Meelora Zerick, a safety examiner with the Tennessee Department of Safety, testified that she was a custodian of records and had access to driver's license applications. Zerick acknowledged that she was subpoenaed to produce records relating to the defendant from 1996 and 1997. Zerick

stated that the defendant applied for and received an identification-only card on August 20, 1996. She noted that the defendant applied for and received a driver's license on August 26, 1997.

David Burns, previously with the Knoxville Police Department's crime laboratory, testified that he transported evidence from the victim's 1997 rape case to the TBI laboratory for comparison with a suspect in November 2003 at the request of Detective Stair. Melanie Phillips testified that she worked as a forensic technician in the TBI's Knoxville office in November 2003. She recalled that she received evidence from David Burns, assigned it a laboratory number, and placed it in a secure vault. Phillips stated that due to staffing shortages in the Knoxville office, Steve Scott transferred the evidence to the Nashville office where it was assigned to Oakley McKinney, a forensic scientist, and Mike Turbeville, a serologist.

Agent Oakley McKinney testified he worked at the TBI crime laboratory as a forensic scientist specializing in latent prints, and he was accepted as an expert in the field. Agent McKinney stated that he examined a piece of gray duct tape that had a "little bit of paper on the back" but that he did not find any latent prints on it.

Agent Mike Turbeville, accepted by the trial court as an expert in DNA forensic science and serology, testified that in early 2004, he examined the victim's clothing, pillowcases, mattress cover, and blankets for the presence of semen, but none was detected. Agent Turbeville stated that he analyzed the vaginal swabs taken from the victim and that although he detected the presence of human semen on two of the three swab packs, he found no sperm.

Agent Turbeville testified that he isolated DNA from the "non-sperm fraction" on the swabs and that he compared it to the victim's and defendant's genetic profiles. He explained that the DNA was a mixture of the victim's profile "for the most part" and a male minor contributor. He said that the defendant's profile was consistent with the sample at five out of thirteen loci and could not be excluded from the remaining eight loci.

On cross-examination, Agent Turbeville testified that he created a report called an electropherogram, which is essentially a line with peaks where the peaks indicate major contributors to the DNA. He said that the more DNA present, the higher the peak will be at that location. Agent Turbeville explained that sometimes "stutter peaks," which are peaks on the chart that are not actually representative of DNA alleles, occur on the electropherogram. He noted that every person inherits one DNA allele from each parent at each locus. Agent Turbeville acknowledged that at one locus in particular, there was a possible stutter peak that would have been consistent with one of the defendant's alleles. However, he noted that he called that locus consistent with the defendant's DNA based, not on the presence of the stutter peak, but on a peak that was consistent with the defendant's other allele at that locus. Asked whether, at some of the other loci, certain stutter peaks could actually be alleles, Agent Turbeville said that it was "not impossible," but he did not think they were alleles because "when you've got a lot of DNA . . . and especially when you've got an individual [who is the] major contributor . . . very substantially, and a minor contributor, it's typical to see these peaks here, in the stutter position."

Asked on further cross-examination why two peaks on the chart at another locus appeared small, Agent Turbeville explained that those peaks appeared small compared to some of the larger peaks but they were still above the requisite threshold. With regard to another locus, Agent Turbeville agreed that the software showed one peak that was not consistent with either the victim or the defendant, but he said he thought the peak was "inconclusive" because "the software did call it and it was in the stutter position." He noted that this particular peak was approximately fourteen percent of the height of the major peak and that TBI protocol was to call any peak that was twelve percent of the size of the major peak an allele, but he explained that they "can interpret this based on our experience . . . from looking at these profiles over the years." However, Agent Turbeville acknowledged that he included that particular peak on his chart of the alleles. On redirect examination, Agent Turbeville restated his opinion that the defendant could not be excluded as a contributor to the biological matter he tested. The defendant was convicted upon the foregoing evidence of two counts of aggravated rape.

## I. SUPPRESSION OF IDENTIFICATIONS

Before trial, the defendant filed a motion to suppress the in-court and out-of-court identifications of him and his tattoos, arguing that the victim had limited opportunity to view her attacker during the incident and that the identification procedure was unduly suggestive which led to an unreliable identification. The trial court conducted a hearing on the matter on November 7, 2006. At the hearing, Ed Stair testified that he was a retired detective with the Knoxville Police Department. Detective Stair stated that in 2002 he investigated five unsolved 1997 rape cases. He said he discovered a DNA match to the defendant in two of the rape cases and, in response, obtained a blood sample from the defendant and took photographs of his arms. Detective Stair recalled that one victim–the victim in this case–had previously helped create a composite drawing of her attacker's face and the tattoos on his arms. He noted the victim had given the following description of her attacker:

> [H]e was a white male, age 35 to 45, 5'10" to 5'11", 170 to 180, medium build, two inch long brown curly hair parted on the right side, brown mustache, blue jeans, black belt, . . . blue buttoned-down shirt with white design, and a watch with blue trim and black velcro band.

Detective Stair testified that he contacted the victim in July 2002 and asked her to come to the police department to view a photographic lineup. He said that he assembled a lineup, including the driver's license photograph of the defendant and other photographs he received from the sheriff's department and that the photographs were lying on a table when the victim entered the room. Detective Stair remembered that after one or two seconds, the victim identified the defendant as her attacker. He stated that he then showed the victim photographs of the defendant's tattoos, from which she immediately identified photographs of the tattoos she had drawn in 1997.

On cross-examination, Detective Stair testified that he thought the ages of the individuals in the photographs were "pretty close" to the thirty-five to forty-five age range and that the hair color of the individuals looked "about the same." Detective Stair acknowledged that when he telephoned the victim he told her they had developed a suspect based on DNA matches in two other rape cases. He also acknowledged that the various rape victims from that time were familiar with each other from counseling groups and therapy sessions. Detective Stair agreed that he only showed the victim photographs of the defendant's tattoos. He recalled that the victim identified a peacock tattoo that went around the defendant's arm, and he acknowledged that the victim's drawing was not of a peacock. He said that the victim also identified another of the defendant's tattoos and that he then told her that the tattoos belonged to the man she identified, who was the same man identified by the DNA.

The victim testified at the suppression hearing that she was raped in her home on June 4, 1997, and that she subsequently helped create a computerized composite drawing of her attacker. She said she made freehand drawings of her attacker's tattoos and provided descriptions of the tattoos. The victim said she continued to live in Knoxville for approximately fourteen months after the attack, during which time she viewed lineups consisting of six to ten photographs on approximately nine to twelve occasions. She also stated that immediately after the attack, she looked at "dozens if not over a hundred different photos . . . [and] books of tattoo images."

The victim testified that after she moved to Georgia in 1998, she did not hear from the Knoxville Police Department until 2002, when Detective Stair contacted her. She said that Detective Stair told her there had been a DNA match in a rape case in Knoxville similar to [hers] "and was believed to be connected." She stated she traveled to the Knoxville Police Department the next day and entered a room where 8-1/2 x 11-sized photographs were laid out on a desk. The victim recalled that she recognized her attacker's photograph instantly but "took an extra few seconds just to make sure and looked at each photograph carefully." She remembered Detective Stair then handed her a stack of photographs of tattoos and said she "had a very strong reaction" to the photographs.

On cross-examination, the victim was asked about her opportunity to observe her attacker and his tattoos during the attack. She testified that she was asleep during the early morning of June 4, 1997, when she heard a noise at the front of her house followed by footsteps. She stated that she saw a figure standing in the doorway of her bedroom but was not able to see any of the individual's features at that time because she had just woken up and her eyes had not adjusted to the dark. She said that her room was dark but that there was a light on in the hallway. She related that the individual leapt on her bed and held her down, that at this point her eyes started to adjust to the light, and that she was able to get an image of the individual's hair and facial hair. The victim recalled that her attacker covered her face initially with his hand, but then with duct tape and a flannel pillowcase. She remembered that at some point, the duct tape came loose from her skin but that she could not see anything because she was in a face-up position with the pillowcase still over her head. The victim stated, however, that her attacker flipped her over and the pillow case fell down in a way that a gap was between her face and the edge of the pillow case, at which point she was able to bend back and look around.

The victim testified that by this point her eyes had adjusted to the light and she could see her attacker's arms as he was grabbing various of her body parts. She said that once she saw his arms, she focused on his tattoos and turned her head side-to-side to see both arms. She stated that because her attacker did not seem bothered by her head movements, she completely turned her body around to the right side and stared at him. She estimated that she viewed his tattoos for a couple of minutes and his face anywhere from fifteen to thirty seconds. The victim testified she "remembered the overall shape with the circular center" of the tattoo on her attacker's right arm and "wasn't sure if perhaps it was a dragon or something exotic[.]" The victim acknowledged that she did not identify a dragon or mark a head on the diagram she drew of the tattoo on her attacker's left arm. She said she thought the tattoo was "that blue-black" color. The victim said that she went for overall shape in her drawing because it was "pretty distinctive." She did not recall her attacker's tattoos depicting anything specific.

The victim testified that after she stared at her attacker's face for fifteen to thirty seconds, she was scared that it would become apparent what she was doing and that she knew she had what she needed. She acknowledged that she did not have any other opportunities to view her attacker. The victim agreed that even though she had viewed several lineups over the years, she did not view any from the time she moved to Georgia until 2002, when she received the call from Detective Stair. The victim acknowledged that she was acquainted with some of the other victims from related rape cases and that she had talked to some of those victims after she "had been up to Knoxville."

The victim testified that when she arrived at the police station, she and Detective Stair "exchanged pleasantries" and went into the room to view the lineup. The victim remembered that the defendant's photograph was the top left-hand photograph in the array and acknowledged that it probably was the first image that caught her eye. However, she said she absolutely looked at the other photographs. The victim remembered describing her attacker's "curly hair and the mustache and the eyebrows, the bushy eyebrows and the cheekbones" to the police years earlier, but she did not recall ever having told the police she did not get a good look at her attacker's face. With regard to the individuals in the 2002 array, the victim said "[e]ach photograph had something that was similar . . . whether it was eyebrows or the hair or a mustache that was similar in appearance." She admitted that some of the individuals had features that indicated to her that it was not that person. When shown photographs from the lineup, the victim noted that some of the individuals had various dissimilarities to what she remembered of her attacker.

The victim testified that after she made her identification, Detective Stair thanked her and nodded and then asked her to look through a stack of tattoo photographs. She said that he did not tell her anything about the source of the photographs but that she wondered if they had come from the person identified from the DNA match. The victim stated that she recalled one, two, or more of the tattoos in the photographs. She said that after she picked out the tattoos that she remembered, she was told they belonged to the man she had identified from the lineup.

The trial court concluded that neither the photographic lineup nor the set of tattoo photographs were impermissibly suggestive. The court determined that there was not a likelihood

of irreparable misidentification based on the identification procedures and denied the defendant's motion to suppress.

The defendant contends that the trial court erred in not suppressing the out-of-court and in-court identifications of him and his tattoos. He argues that the identification procedure was impermissibly suggestive because the victim was told that a suspect from related rape cases had been identified by DNA evidence; the defendant's photograph was in the top, left-hand corner of the lineup; and none of the other photographs accurately matched the victim's description of her attacker.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). A trial court's factual findings in a motion to suppress hearing are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences drawn from that evidence. State v. Hicks, 55 S.W.3d 515, 521 (Tenn. 2001). The application of the law to the facts as determined by the trial court is a question of law that is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

In Simmons v. United States, 390 U.S. 377 (1968), the United States Supreme Court discussed the potential hazards of an identification procedure involving photographs as opposed to a lineup. However, the Court also recognized the use of photographs as an effective procedure "from the standpoint both of apprehending offenders and of sparing innocent suspects the ignominy of arrest by allowing eyewitnesses to exonerate them through scrutiny of photographs." Id. at 384. It concluded that "convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Id.; see, e.g., Sloan v. State, 584 S.W.2d 461 (Tenn. Crim. App. 1978). The Court in Simmons noted that the potential for misidentification is increased when one photograph is "in some way emphasized" or "if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." 390 U.S. at 383 (footnote omitted). Thus, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting Stovall v. Denno, 388 U.S. 293, 301-02 (1967)).

In this case, the defendant argues that his photograph was emphasized in the array because each of the other individuals was somewhat different from the description given by the victim and that his photograph was placed as the first in the array. Upon review of the photographs, we cannot

conclude that the defendant's photograph was "grossly dissimilar" to the others. See State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing United States v. Wade, 388 U.S. 218, 233 (1967), for the proposition that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar"). Interestingly, as noted by the trial court, the defendant's photograph itself was different from the victim's original composite drawing, given that he did not have a mustache and that his hair was a different length. Moreover, all of the photographs were of the same size and background, and all of the individuals were dressed in street attire. Nevertheless, we recognize that the photographic identification procedure may have arguably been suggestive because of Detective Stair's statement to the victim that there had been a DNA match in possibly related cases.

However, even if the identification procedure were unnecessarily suggestive, suppression is only required when the totality of the circumstances shows that the identification was unreliable. See Neil v. Biggers, 409 U.S. 188, 198-99 (1972). In Biggers, the United States Supreme Court set forth five factors to be considered when determining whether an identification is reliable and thus admissible: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. Id. at 200. The court must consider the "totality of the circumstances" in determining whether the identification was reliable. Id.

A review of the five factors supports a conclusion that the victim's identification of the defendant was reliable and therefore admissible. First, although the victim's opportunity to view her attacker was limited because of the minimal lighting and the duct tape over her eyes, she testified that she was able to see her attacker's face through the pillowcase for fifteen to thirty seconds after the duct tape slid off and her eyes adjusted to the light. Second, the victim's degree of attention was very high. She testified that she knew she had to study her attacker in order to identify him if she survived. Third, the victim's description of her attacker was sufficiently detailed and accurate. Fourth, the victim testified that she instantly recognized her attacker, and at trial, she elaborated that she was "100 percent certain" of her identification. Detective Stair testified that the victim identified her attacker after one to two seconds. Fifth, although the five-year length of time between the incident and identification is long, the victim said she had looked through "[h]undreds" of photographs since the incident. Upon consideration of the Biggers factors and the totality of the circumstances, we conclude that the photographic identification of the defendant was reliable and that the trial court did not err in denying the defendant's motion to suppress in this regard.

With regard to the victim's identification of the defendant's tattoos, the defendant likewise argues that the identification procedure "was so impermissibly suggestive as to lead to a very substantial likelihood of irreparable misidentification." The State noted at the hearing on the motion to suppress that the procedure used in this case of having the victim look through a stack of photographs of only one person's tattoos was arguably akin to a show-up. Show-up procedures are inherently suggestive. See State v. Thomas, 780 S.W.2d 379, 381 (Tenn. Crim. App. 1989). The

identification may, however, satisfy due process as reliable and admissible under the totality of the circumstances. State v. Brown, 795 S.W.2d 689, 694 (Tenn. Crim. App. 1990).

We consider the five Biggers factors as applied to the identification of the defendant's tattoos. The victim testified that she observed her attacker's tattoos for a couple of minutes and "went into a very analytical survival mode . . . staring at the tattoos." She drew sketches of the tattoos showing the overall shapes but was not sure what specific images the tattoos depicted. Even though she did not note that one tattoo was of a peacock or that the wrap-around tattoo was connected with a skull and dragon head, the similarities between her drawings and the defendant's tattoos are apparent. The victim "had a pretty strong reaction" when shown the tattoos and was very clear as to which tattoos she recalled and did not recall. Finally, although the five-year time period between the incident and identification is a negative factor with regard to reliability, it should be noted that the victim estimated she had observed "[e]asily dozens" of tattoo photographs since the incident. Upon consideration of the Biggers factors and the totality of the circumstances, we conclude that the photographic identification of the defendant's tattoos was sufficiently reliable and that the trial court did not err in denying the defendant's motion to suppress in this regard. The defendant is not entitled to relief on this issue.

## II. PROSECUTORIAL MISCONDUCT

The defendant next contends that the trial court erred in failing to grant his motion for new trial when the State engaged in four types of prosecutorial misconduct during its closing argument. Citing several examples for each allegation of prosecutorial misconduct, the defendant argues that the State (1) improperly bolstered the victim's credibility, (2) misstated evidence from trial during rebuttal argument, (3) argued matters outside the record, and (4) inflamed the passions and prejudices of the jury. The State responds that the defendant has waived this issue by failing to object contemporaneously to the prosecutor's statements at trial or, in the alternative, that the prosecutor's statements did not affect the outcome of the case.

In his first group of claims of prosecutorial misconduct, the defendant asserts that the prosecutor improperly bolstered the victim's credibility. The defendant lists the prosecutor's use of the victim's testimony that the rape was a "life-defining moment," his mention of his own life-defining moment, and the invitation to the jurors to recall their own life-defining moments. The defendant also claims the prosecutor bolstered the victim's testimony by saying the victim had an empathetic personality and had been concerned about the jurors' feelings during trial.

In his second group of claims of prosecutorial misconduct, the defendant argues that the prosecutor intentionally misstated evidence in its rebuttal when referring to the testimony of its expert witness and the color of the tattoo on the perpetrator's left wrist. For the expert witness testimony, the defendant argues the State misstated the evidence by saying the witness's testimony excluded the possibility that a third person's DNA was revealed through testing, i.e., that the twelve allele was from a source other than the defendant and the victim. On cross-examination, however, the expert witness acknowledged that the "twelve allele" was inconsistent with the DNA profiles of

the defendant and the victim, although the expert witness stated it was "unlikely" that the profile had come from someone other than the defendant. Regarding the tattoo color, the defendant argues that the prosecutor misstated the evidence when he said the victim testified that one of the defendant's tattoos was two colors, blue and black, and not one color, "blue-black."

For his third grouping of claimed prosecutorial misconduct, the defendant argues the prosecutor committed misconduct by arguing facts outside the record, specifically that the birth of his child was a life-defining moment and that the jurors have had their own life-defining moments; that the defendant was wearing "phony glasses" at trial; that the defendant was wearing the same "trophy" shirt at trial that the perpetrator had worn at the rape or at least the same style of shirt; and that the defendant could have obtained additional tattoos between 1997 and 2002, when his tattoos were photographed.

In his fourth grouping of claimed prosecutorial misconduct, the defendant argues that the prosecutor told the jury the defendant claimed the witnesses against him were lying and that this argument inflamed the passions of the jury. The defendant asserts that the defense was interrogating the witnesses to expose the possibility that the victim had been unable to see the perpetrator's face due to the lighting conditions, the duct tape over her eyes, and the pillowcase covering her head and that DNA testing allowed the possibility that another source of DNA existed in addition to the DNA of the defendant and the victim. He further argues that the prosecutor inflamed the jury's passions and prejudices by standing near the defendant and pointing a finger at him during closing argument.

The Tennessee Supreme Court has recognized that "argument of counsel is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Attorneys have great leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion. Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001). However, closing argument must be "temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried." Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976). Prosecutorial misconduct does not constitute reversible error unless the outcome was affected to the defendant's prejudice. State v. Bane, 57 S.W.3d 411, 425 (Tenn. 2001). In Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), this court set out the following considerations for determining whether the State's conduct could have improperly prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

See also State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (approving these factors in determining if the misconduct resulted in reversible error).

As the State points out in its brief, the defendant failed to object at trial to any of the prosecutor's statements. He did, however, raise allegations of prosecutorial misconduct in his motion for new trial, specifically that the State argued facts that were not in the trial evidence (the defendant's shirt and glasses), that the prosecutor stood next to the defendant, pointed his finger at him, and addressed the closing argument to the defendant, and that the State misstated the testimony about the twelfth allele. By not objecting contemporaneously to this conduct, he has waived our review of this issue. See T.R.A.P. 36(a); Tenn. R. Crim. P. 52(b) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); see also State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged misconduct during closing argument waives any later complaint). To determine whether the challenged remarks constitute plain error, we consider five factors. See State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). Those factors are: "'(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'" Id. at 282 (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be established before we will find plain error. See Smith, 245 S.W.3d at 283. Ultimately, the error must have been "'of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (Tenn. Crim. App. 1994) (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

We have reviewed each of the defendant's allegations of prosecutorial misconduct in the context of the entire argument and are not convinced of plain error. We conclude that none of the statements "probably changed the outcome of the trial," and the defendant is not entitled to relief on this issue.

### III AND IV. SENTENCING

The defendant raises two sentencing considerations. Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. § 40-35-401(d). As the Sentencing Commission Comments to this section note, the burden is now on the defendant to show that the sentence is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

-15-

However, "the presumption of correctness which accompanies the trial court's action is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In this respect, for the purpose of meaningful appellate review,

> the trial court must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. T.C.A. § 40-35-210(f) (1990).

State v. Jones, 883 S.W.2d 597, 599 (Tenn. 1994).

Also, in conducting a de novo review, we must consider (1) the evidence, if any, received at the trial and sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct, (5) any mitigating or statutory enhancement factors, (6) any statement that the defendant made on his own behalf, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-102, -103, -210 (2003); see Ashby, 823 S.W.2d at 168; State v. Moss, 727 S.W.2d 229 (Tenn. 1986).

The trial court conducted a sentencing hearing on February 2, 2007, at which Christina Stanley testified to the facts and circumstances of a 1998 case involving the defendant. Stanley testified that on August 24, 1998, she was eighteen years old and lived with her husband on Fifth Street in Maryville, Tennessee. Stanley said that prior to that day, she and her husband had noticed that "a couple of things [had] moved" around their house and "things . . . had been misplaced." She specifically recalled there was a carton of cigarettes they could not locate. Stanley stated that she and her husband went to bed on the night of August 24, but she was awakened in the "late hours that night" by a man standing beside the bed with his hand in her underwear and "fingering" her. She said that she was "a little disoriented" at first and thought that it might have been her husband; however, she was able to see the man's face from the street light shining in the window and realized it was not her husband. Stanley recalled that she screamed, and the man ran out of the bedroom. She stated that she told her husband what had happened and he initially told her it was a dream, but they went into the living room and "noticed that it was not just a dream." She said the contents of her purse were "strewn out on the floor," the living room furniture had been moved "for a clear shot from the bedroom door to the front door," the front screen door was propped open, and some items were missing, including a dish towel, flashlight, a butter knife, some money, her Social Security card, and her change purse. Stanley recalled that the items were later returned to her and that the missing carton of cigarettes was found in the "R.V. where [the defendant] was living." Stanley stated the defendant had gained access into their house by prying open a window in the den area. Stanley identified the defendant in court as the man who entered her house in August 1998.

At the conclusion of the sentencing hearing, the court sentenced the defendant as a career offender to sixty years on each conviction. The court ordered that the sentences be served consecutively upon finding the defendant was a professional criminal, the defendant's record of criminal activity was extensive, and the defendant was a dangerous offender, for an effective sentence of 120 years in the Department of Correction. See T.C.A. § 40-35-115(b)(1), (2), and (4).

## A. Career Offender Status

The defendant argues that the trial court erred in classifying him as a career offender because his prior convictions were not found by the jury beyond a reasonable doubt. He acknowledges that the United States Supreme Court held in Almendarez-Torres v. United States, 523 U.S. 224, 239-47 (1998), that prior convictions could be found by a judge without the assistance of a jury. See also Cunningham v. California, 549 U.S. 270, 282 (2007) (stating that "[o]ther than a prior conviction, see Almendarez-Torres v. United States, we held in Apprendi [v. New Jersey], 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt'") (internal citations omitted). However, the defendant wishes to preserve the issue "in anticipation of a future change in the law, and for further federal court review." This court is bound by United States Supreme Court precedent. Accordingly, the defendant's more than twenty prior felony convictions listed on the notice of intent to seek enhanced punishment and presentence report are, as noted by the trial court at sentencing, "[f]ar more than necessary to make him a career offender." See T.C.A. § 40-35-108. The defendant is not entitled to relief on this issue.

## B. Consecutive Sentencing

The defendant argues that the trial court erred in ordering that his sixty-year sentences be served consecutively because "Tenn. Code Ann. § 40-35-115(a) requires concurrent sentences unless there are additional findings of fact by a preponderance of evidence, and those additional facts were not found by a jury beyond a reasonable doubt, thereby violating [his] right to trial by jury and due process." The defendant's argument relies on his assertion that State v. Gomez, 239 S.W.3d 733 (Tenn. 2007) ("Gomez II"), extends to consecutive sentencing. In Gomez II, our supreme court held that, in light of Cunningham, the enhancement of a defendant's sentence based on facts not found by a jury violated a defendant's rights under the Sixth Amendment. Gomez II, 239 S.W.3d at 740-41. However, the court stated, "Our holding does not, however, affect the trial court's determinations regarding manner of service or the imposition of consecutive sentences." Id. at 743. Moreover, our supreme court held recently "that Apprendi and Blakely should be construed narrowly such that they do not apply to Tennessee's statutory scheme for imposing consecutive sentences." State v. Allen, 259 S.W.3d 671, 688 (Tenn. 2008); Oregon v. Ice, 129 S. Ct. 711, 714-15 (2009) (holding 6th Amendment does not preclude judges from finding facts needed to impose consecutive sentences). The defendant's issue is without merit.

In addition, we conclude that consecutive sentencing was appropriate in this case. Consecutive sentencing is guided by Tennessee Code Annotated section 40-35-115(b), which states

that the court may order sentences to run consecutively if it finds by a preponderance of the evidence that certain facts exist. If the court finds that the defendant is a "dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high" pursuant to Code section 40-35-115(b)(4), the court must also determine that "an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences must reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). Here, the trial court made extensive findings regarding consecutive sentencing, concluding that:

> [The defendant] clearly is a man with such extensive criminal history that he may be found a professional criminal . . . [a]nd that has been his major source of livelihood apparently[;] . . . the defendant is an offender whose record of criminal activity is extensive[;] . . . [and] there can be no question that there's a dangerous offender status . . . . No hesitation about not only committing the crime but committing it until you're good and well ready to go. . . . [The defendant's] convictions are all over this state . . . in which homes have been invaded, victimization of individuals in most of these charges exists, whether it is by burglarizing a person's house, or stealing from someone, or physically attacking someone. And I find that the community and the citizens are surely endangered by the presence of [the defendant] on the streets.

See T.C.A. § 40-35-115(b)(1), (2), and (4). The record fully supports the trial court's determinations, and we will not disturb the trial court's sentencing. The defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE