# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 12, 2012

## TONY HOLMES v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 04-03960     James C. Beasley, Jr., Judge**

---

**No. W2011-02524-CCA-R3-PC  - Filed June 28, 2012**

---

A Shelby County jury convicted petitioner, Tony Holmes, of one count of first degree premeditated murder and one count of attempted first degree premeditated murder. The jury sentenced him to life in prison for first degree murder, and the trial court sentenced him as a repeat violent offender to life in prison without the possibility of parole for attempted first degree premeditated murder, to be served consecutively. Following an unsuccessful direct appeal to this court, he filed a petition for post-conviction relief alleging that appellate counsel was ineffective for failing to argue that the trial court erred in denying his motion to suppress an eyewitness's identification of him. He also contended in his petition that trial counsel was ineffective for improperly making personal attacks against the prosecutor during closing arguments, for failing to impeach witnesses with their prior criminal convictions, and for failing to impeach a witness with her prior inconsistent statement to police. Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and JEFFREY S. BIVINS, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Tony Holmes.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and Stacey McEndree and Kate Edmands, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. Procedural History

Petitioner filed a timely pro se petition for post-conviction relief on November 4, 2010. The post-conviction court appointed counsel on November 16, 2010, and counsel filed an amended petition on April 29, 2011. The post-conviction court held an evidentiary hearing on June 24, 2011, denied relief in open court on September 23, 2011, and entered an order to that effect on October 14, 2011. This appeal follows.

## II. Facts

### A. Trial

On direct appeal, this court summarized the following facts from the evidence presented at trial:

> This case involves the murder of Lindsey Gilland, who was a bystander caught in the middle of a shooting. Testimony at trial revealed that the defendant intended to shoot Doyan McGory but, instead, shot the victim when McGory grabbed the victim and used him as a shield.
>
> Jeannie Stewart testified at trial that she was walking by a business, the Crankshaft Specialist, on May 19, 2004, when she saw the defendant park his car on the street, exit the car carrying a gun, walk in front of his car, approach the intended victim, and point the gun at him. The intended victim grabbed the victim and used him as a shield. The defendant fired the gun, shot the victim in the chest, and then fled the scene. Stewart testified that she had known the defendant for twenty years and had no doubt about his identity. She alleged that she was reluctant to testify because she knew that people in the community considered her a "snitch." On cross-examination, she testified that she told the officers at the scene that she knew nothing about the shooting but clarified that she meant she did not know the reason the defendant would attempt to kill McGory.
>
> An employee of Crankshaft Specialist testified that he was working on May 19, 2004, when he saw the victim sitting on a milk crate talking to McGory prior to the killing. He looked out the rear door of the business and saw the defendant exit his car with a gun. He observed him approach the victims and saw McGory "bobbing and weaving" behind the victim.

Phyllis Tuggle testified and denied telling police that the defendant was in the neighborhood on the date of the shooting. She further denied telling police that McGory had threatened to kill the defendant.

An officer with the Memphis Police Department testified that he responded to the shooting incident and found the victim in a gray Cadillac. After the officer spoke with people at the crime scene, the defendant was considered as a suspect. Another officer with the Memphis Police Department testified that he also responded to the scene and received information that the defendant fled the scene in a gray Chevrolet Celebrity. The vehicle was later recovered, but no evidence was found in the vehicle.

A sergeant with the Memphis Police Department who investigated the shooting testified that he interviewed Ms. Tuggle and that she told him she spoke to the defendant on the date of the shooting. He testified that Ms. Tuggle told him that the defendant said McGory had shot at the defendant's brother on one occasion and had chased the defendant with a machete earlier on the day of the shooting. The sergeant notified federal authorities that the defendant had fled to Flint, Michigan. He said that Flint police arrested the defendant on June 4, 2004.

. . . . .

A professor of psychology at Florida State University testified as an expert in the area of eyewitness identification on behalf of the defendant. He testified that a number of factors could influence the reliability of an eyewitness identification.

*State v. Tony Curtis Holmes*, No. W2007-02733-CCA-R3-CD, 2009 WL 3047007, at *1-2 (Tenn. Crim. App. Sept. 24, 2009), *perm. app. denied* (Tenn. March 15, 2010).

B. Post-Conviction Evidentiary Hearing

Petitioner presented appellate counsel as the first witness at the evidentiary hearing. Appellate counsel testified that in preparing for the appeal, he read the entire record. He reviewed the motion for new trial, knowing that he was limited to appealing the issues preserved in the motion. He further testified that although the issue regarding the trial court's admission of a photographic identification was preserved in the motion for new trial, he did not raise the issue on appeal. He stated that he did not raise the issue because he did not think it would be successful and would "cloud the other issues." Appellate counsel recalled

that the trial court commented that the line-up could be seen as suggestive but not overly suggestive, and after reviewing it, appellate counsel felt that the array was not suggestive to the point of winning an appeal. He had raised similar issues in other cases in which he felt the photograph array was more suggestive than in petitioner's case and was unsuccessful. He thought that the issue would detract from other more meritorious issues.

Petitioner next called trial counsel as a witness. Trial counsel did not recall the exact number of times he met with petitioner but stated that he probably met with him one time per week. Trial counsel also wrote letters to petitioner. He estimated that they probably met approximately twenty times. Trial counsel testified that he liked petitioner because he believed that the intended victim, Doyan McGory, was a neighborhood bully who had terrorized petitioner for years. He believed the allegations contained in the police reports that an altercation, likely initiated by Mr. McGory, led to Mr. McGory chasing petitioner through the neighborhood with a machete. Although petitioner would not admit it, trial counsel further believed that petitioner became frustrated with Mr. McGory's bullying him, so later in the day he obtained a weapon, located Mr. McGory, and tried to kill him. Trial counsel also empathized with him because "[petitioner's] upbringing was so horrifying . . . ." Despite petitioner's violent criminal history, trial counsel found him to be very nice and very respectful. In sharp contrast, petitioner testified that his attorneys met with him "probably one time." Petitioner testified that the only other meetings they had were in the room behind the courtroom.

Trial counsel testified that he fully investigated the case. Petitioner gave him the name of a "rapper" whom he wanted counsel to question, but the information did not lead to anything useful. Co-counsel also testified at the evidentiary hearing. He added that petitioner asked them to question his brother, Steven Holmes, who petitioner thought would provide him with an alibi for the time of the shooting. Co-counsel asked their investigator to interview petitioner's brother, and the investigator relayed to co-counsel that the brother's statement did not support an alibi defense.

Petitioner testified that he did not believe that his attorneys adequately prepared his case or properly prepared him for trial. He thought they assumed he was withholding information and because he did not tell them what they wanted to hear, they did not give him their full attention. He also testified that people in the community told his attorneys that he was not involved, but they failed to present that evidence.

Petitioner faulted his attorneys for not securing an alibi defense from his brother but testified that at the time he was at his brother's house, his brother was at the dog track. He first testified that he stayed at his brother's house because he had just been released from

prison and had no where else to go, but on cross-examination, he testified that he had leased an apartment in his name that he shared with his girlfriend.

The State initially sought the death penalty in petitioner's case but withdrew its intent to seek a death sentence after petitioner's mental evaluation. Trial counsel stated that he had represented other defendants facing the death penalty, and petitioner was "nowhere as evil as those others." He believed that if he had used the defense that Mr. McGory "required killing," they would have been more successful, but petitioner never admitted his involvement. The day before jury selection, trial counsel questioned petitioner in open court with respect to the State's offer to plead guilty and receive a life sentence. Petitioner declined to accept the plea offer. The case proceeded to a jury trial as a "life without parole" case, but trial counsel presented a defense that led to the jury sentence of "life." The trial court imposed a sentence of "life without parole" for the charge of attempted first degree murder.

Trial counsel advised petitioner that the ultimate decision of whether to testify rested with petitioner, but that if he chose to testify, the State would likely introduce evidence of two prior homicides he committed and would likely explain to the jury that Ms. Stewart, the eyewitness, had not seen petitioner for fourteen years because he was in prison for those convictions. Trial counsel also thought that petitioner, being inarticulate, would not have withstood cross-examination by the State. The trial court questioned petitioner about his decision whether to testify, and petitioner informed the court that he chose not to exercise his right to testify. During his testimony, co-counsel confirmed that the decision whether to testify was always petitioner's decision, and they did not threaten, coerce, or promise him anything in exchange for waiving his right to testify.

Petitioner testified that he wanted to take the stand and that his attorneys told him he could not. He said the trial court "went in an uproar" when he said he wanted to testify. He further asserted that his attorney took it upon himself to inform the trial court of petitioner's decision not to testify. However, he acknowledged that when the court asked him about his decision, he explained to the court that based on the advice of counsel, he did not wish to testify. Petitioner stated that his attorneys advised him not to testify.

According to trial counsel, petitioner's testimony at the penalty phase of the trial confirmed trial counsel's determination that petitioner should not have testified during the guilt phase. Upset about the verdict, petitioner chose to testify against counsel's advice. Trial counsel thought that petitioner's appearance as a whole did not evince innocence. Petitioner had extremely long talon-like fingernails that he refused to cut, though trial counsel requested him to do so. During the penalty phase, petitioner somehow ripped the talons from his fingers, evoking an astonished response from the jury because he engaged

in such conduct. Petitioner also "rambled on and on and on for several pages throughout the transcript," "[testifying] without interruption for a while" "[u]ntil [the trial court] finally cut him off."

Trial counsel had investigative assistance in preparing the case. The investigator discovered prior convictions of Jeannie Stewart, who trial counsel believed was an important State witness. Ms. Stewart had several misdemeanor theft convictions that could have been used to impeach her as crimes involving dishonesty. Trial counsel testified that his defense strategy involved the witness's misidentification of appellant. As such, he did not believe that the witness's credibility was at issue. At trial, he did not allege she was lying to protect someone; he alleged that she was mistaken in her identification of appellant. He also did not think that theft convictions from nine years earlier "were of much consequence." He was aware of the convictions and made a strategic decision not to use them as impeachment.

Post-conviction counsel questioned trial counsel with regard to the motion to suppress Ms. Stewart's identification of him at trial. As evidenced in the transcript of the motion, when police initially questioned Ms. Stewart, her first response was that she did not know the identity of the shooter. She then stated that as police were questioning members of the crowd, she admitted that she knew the identity of the shooter. Ms. Stewart maintained that she first lied to law enforcement because she did not want to be involved. Post-conviction counsel asked trial counsel why, at trial, he asked Ms. Stewart, "Did you tell the police officers that arrived at the scene that you didn't know anything about the shooting," rather than a more clear question, such as "[D]idn't you tell the officers on the scene you did not know the shooter?" Trial counsel acknowledged that his question could have been more clear but that one becomes excited and nervous in the trial setting.

At trial, the State questioned Ms. Stewart about her community's attitude toward "snitches." Trial counsel lodged an objection based on relevance, which the trial court overruled. The court permitted Ms. Stewart to answer the question, leading to the State's follow-up question regarding whether the witness was pressured to not testify. Post-conviction counsel questioned why trial counsel did not object based on hearsay, to which trial counsel responded, "In retrospect[,] both objections on both grounds should have been made." Trial counsel testified on cross-examination that the answer to the State's question did not involve a hearsay response.

At the hearing on the motion to suppress an eyewitness's identification of petitioner, trial counsel called Doyan McGory, the intended victim, as a witness. Trial counsel understood that pursuant to Rule 26.2 of the Tennessee Rules of Criminal Procedure, he would not receive prior statements to law enforcement from the State because Mr. McGory was a defense witness. He recalled that on cross-examination, the State questioned the

witness about prior inconsistent statements. Post-conviction counsel inquired why trial counsel did not object and ask the court to allow him to question the witness using his prior consistent statements. Trial counsel answered that "[he] should have." However, on cross-examination, trial counsel acknowledged that Mr. McGory's testimony at the suppression hearing encompassed the facts (1) that he identified petitioner in great detail and also that (2) he identified him in a photographic line-up, neither of which assisted trial counsel in his defense of petitioner. Trial counsel personally observed the witness's testimony and did not find him to be credible. He recalled the trial court's comment that if either side called him as a witness, "buyer beware."

Post-conviction counsel questioned co-counsel regarding whether the defense should have called Mr. McGory as a witness at trial. Co-counsel testified that choosing not to call Mr. McGory was "absolutely the right thing to do," describing him as a "wild card" who "would never repeat the same phrase twice." He thought that the State declined to call Mr. McGory for the same reasons. Observing Mr. McGory testify at the suppression hearing assisted counsel in deciding whether to call him as a trial witness. Petitioner believed that his attorneys should have called Mr. McGory because although he identified petitioner from a photographic line-up, he could not make an in-court identification at the suppression hearing. Through cross-examination of petitioner, the State alluded to intimidation of Mr. McGory as the reason he did not make an in-court identification of petitioner.

At trial, a second eyewitness, Booker Jones, identified appellant in court as the perpetrator in the case. Trial counsel acknowledged that Mr. Jones also had a criminal record, a misdemeanor theft conviction from 1995. He was aware of Mr. Jones's record at trial. Trial counsel explained his reasons for not using the conviction to impeach Mr. Jones: (1) the conviction was nine years old; and (2) Mr. Jones's identification of appellant was "unshakeable" because the witness had known appellant for years. Trial counsel acknowledged that he could see how impeachment could be useful in undermining an eyewitness's confidence in what he or she claimed to have witnessed. On cross-examination, trial counsel added that he did not use Mr. Jones's prior conviction because he was an older man and a good witness. He thought that it would reflect badly on the defense if he "[gave] this older man a hard time . . . ."

Co-counsel's testimony at the post-conviction hearing supported the theory advanced by trial counsel. Co-counsel testified that they elected not to question Mr. Jones regarding his prior conviction because they were not trying to emphasize that the witnesses were "lying witnesses" but were "mistaken" witnesses. Their theory was based on the individuals' limited ability to observe and recognize the perpetrator.

Trial counsel testified that a third eyewitness testified at the hearing on the motion to suppress but did not testify for the State at trial. Co-counsel added that although the witness did not testify for the State, the defense called her as a witness, and she could not identify petitioner as the shooter.

Trial counsel realized and communicated to petitioner that the defense of mis-identification was inherently problematic because of Mr. Jones's eyewitness testimony and the testimony of others who identified appellant's vehicle leaving the scene. Petitioner's flight to Michigan immediately following the murder, for which the defense had no reasonable explanation, was also troublesome. However, upon inquiring into a possible alternative defense of justification, petitioner adamantly contended that he knew nothing about the shootings. Therefore, justification as a defense was not feasible, leaving only mis-identification.

With regard to the allegation of making an improper closing argument, trial counsel answered that "[i]t was not well thought out." He said, "There were aspects of the closing argument that if I had to do over again, I would not engage in a personal attack on the Prosecutor." He thought that his statements against the prosecutor "were overboard." However, on cross-examination he recalled that in his argument to the jury, he cited a United States Supreme Court opinion authored by Justice Scalia. He patterned his closing argument from the opinion. He would not have changed his closing argument in general, only the personal attacks on the prosecutor.

Co-counsel testified that the closing argument was based on Justice Scalia's description of the jury as "the final circuit breaker in the Government's machinery of justice." The argument incorporated many terms from the opinion.

III. Analysis

A. Ineffective Assistance of Counsel

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2006). A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (citing *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane*, 316 S.W.3d at 562 (quoting *Grindstaff*, 297 S.W.3d at 216).

Appellate courts do not reassess the trial court's determination of the credibility of witnesses. *Dellinger v. State*, 279 S.W.3d 282, 292 (Tenn. 2009) (citing *R.D.S. v. State*, 245 S.W.3d 356, 362 (Tenn. 2008)). Questions regarding the credibility of witnesses are matters entrusted to the trial judge as the trier of fact. *Dellinger*, 279 S.W.3d at 292 (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). The post-conviction court's findings of fact carry the weight of a jury verdict and are conclusive on appeal unless the preponderance of the evidence is otherwise. *Rigger v. State*, 341 S.W.3d 299, 307 (Tenn. Crim. App. 2010) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997)). However, conclusions of law receive no presumption of correctness on appeal. *Rigger*, 341 S.W.3d at 307 (citing *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Dellinger*, 279 S.W.3d at 294 (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn.1975)). The constitutional right to counsel attaches when adversarial judicial proceedings are initiated against the defendant. *State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). "Initiation" is construed as issuance of an arrest warrant, the time of the preliminary hearing in cases where an arrest warrant is not first issued, or by indictment or presentment issued by a grand jury. *Id*.

To prevail on his claim of ineffective assistance of counsel, petitioner must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Finch*, 226 S.W.3d at 315; *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Baxter*, 523 S.W.2d at 936). To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Strickland*, 466 U.S. at 688). As our supreme court has previously held:

> '[T]he assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence . . . Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.'

*Baxter*, 523 S.W.2d at 934-35 (quoting *Beasley v. United States*, 491 F.2d 687, 696 (6th Cir. 1974)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689); s*ee Finch*, 226 S.W.3d at 316.

To establish that petitioner suffered prejudice as a result of counsel's deficient performance, petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch*, 226 S.W.3d at 316 (quoting *Vaughn*, 202 S.W.3d at 116). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Vaughn*, 202 S.W.3d at 116 (quoting *Strickland*, 466 U.S. at 694); s*ee Finch*, 226 S.W.3d at 316. As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and the reliability of the outcome was called into question. *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694); *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

Petitioner must establish both deficient performance and prejudice therefrom to be entitled to post-conviction relief. *Vaughn*, 202 S.W.3d at 116*; Howell*, 185 S.W.3d at 326. It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

B. Failure to Pursue Appellate Review of the Trial Court's Denial of Petitioner's Motion to Suppress Witness's In-Court and Out-of-Court Identification of Him

To determine whether appellate counsel was constitutionally effective, we apply the two-prong test of *Strickland*, the same test used to evaluate claims of ineffective assistance of trial counsel. *Carpenter*, 126 S.W.3d at 886. This court has held:

> There are two approaches to appellate advocacy, known generally as the 'rifle shot' approach and the 'shotgun' approach. Under the rifle shot procedure, counsel presents only those issues which arguably have merit. Under the 'shotgun' approach, every conceivable issue is raised in hope, albeit slim, that the appellate court will see merit in some arcane issue. The choice of which method to use and the choice as to which issues to present under either approach obviously requires strategic and tactical decisions by appellate counsel. Of course, those decisions are judged by the same standards as all other decisions of counsel.

*Hanson Lee Davis, Jr. v. State*, No. 02C01-9104-CC-00064, 1992 WL 69655, at *1 (Tenn. Crim. App. Apr. 8, 1992) (internal citations and footnote omitted). We will not fault appellate counsel for not raising every possible issue on appeal. *Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995)). Experienced appellate advocates have long "emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Cooper v. State*, 849 S.W.2d 744, 747 (Tenn. 1993) (quoting *Jones v. Barnes*, 463 U.S. 745, 751 (1983)). Determination of the issues to raise on appeal is a matter left to appellate counsel's sound discretion. *Carpenter*, 126 S.W.2d at 887 (citing *Jones*, 463 U.S. at 751). We accord appellate counsel's professional judgment considerable deference with regard to which issues he believes to be meritorious on appeal. *Id.* As in a review of ineffective assistance of trial counsel, we should not second-guess appellate counsel's decisions and must avoid the distorting effects of hindsight. *Id.* However, we will only defer to counsel's tactical choices if such choices are within the range of competence required of attorneys in criminal cases. *Id.* (citing *Campbell*, 904 S.W.2d at 597).

Moreover,

[i]f a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.

*Carpenter*, 126 S.W.2d at 887-88. Thus, to fully review petitioner's claim of ineffective assistance of appellate counsel, we must first determine whether the underlying issue, the reliability of the witness's out-of-court and subsequent in-court identification of petitioner, has merit.

To judge the validity of a pre-trial identification, the trial court must first determine whether the procedure utilized was, in and of itself, unduly suggestive. *Neil v. Biggers*, 409 U.S. 188, 198 (1972). A procedure violates the defendant's due process rights if it is so suggestive as to create a "very substantial likelihood of irreparable misidentification." *Id.* at 198. If a trial court finds that the procedure was unduly suggestive, the next inquiry focuses on whether, under the totality of the circumstances, the identification was nonetheless reliable. *Id.* at 199.

This court has adopted the *Neil* factors set forth by the United States Supreme Court to be utilized in weighing out-of-court identification procedures against the requirement of due process:

> The Court set out five factors to be considered in determining whether an identification is reliable enough to withstand a due process attack despite suggestiveness in the procedure employed. These factors are the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty of the witness at the confrontation, and the length of time between the crime and the confrontation. The degree of reliability in the identification itself, as indicated by these factors, is to be assessed in light of the suggestiveness of the identification procedure and the totality of the circumstances to determine whether a violation of due process has occurred.

*Proctor v. State*, 565 S.W.2d 909, 911-12 (Tenn. Crim. App. 1978) (citing *Neil*, 409 U.S. at 198), *overruled on other grounds by State v. Mitchell*, 593 S.W.2d 280, 286 (Tenn. 1980). However, the trial court need not reach the "totality of the circumstances" test outlined in *Neil* if it determines that the identification procedure itself was "neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification." *State v. Corey Eshmon*, No. W2008-00109-CCA-R3-CD, 2009 WL 3029670, at *10 (Tenn. Crim. App. Sept. 23, 2009); *see State v. Biggs*, 211 S.W.3d 744, 749 (Tenn. Crim. App. 2006).

We first review petitioner's claim that the trial court erred in denying his motion to suppress the photographic identification made by Ms. Stewart. "Photographs contained in a photographic array do not have to mirror the accused. Instead, the law simply requires that the police refrain from 'suggestive identification procedures.'" *State v. Hall*, 976 S.W.2d 121, 153 (Tenn. 1998) (quoting *Neil*, 409 U.S. at 196). Accordingly, "a photographic identification is admissible unless, based upon the totality of the circumstances, 'the confrontation conducted . . . was so unnecessarily suggestive and conducive to irreparable mistaken identification that [the accused] was denied due process of law.'" *Id.* (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). The risk of mistaken identification is greater if one of the photographs in the line-up "'is in some way emphasized or if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime.'" *State v. Scarborough*, 300 S.W.3d 717, 728 (Tenn. Crim. App. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).

-12-

Petitioner argues that his photographic line-up was unduly suggestive because he was the only one whose teeth were showing prominently in the photographs. While it is true that the petitioner is the only man whose picture reveals his teeth, the trial court noted that in reviewing the photographs, it did not notice petitioner's teeth until the defense brought out the fact in the proof. The trial court further stated, "[W]hat struck the Court is that these photographs were strikingly similar and that whoever put together the photospread had done a remarkable job . . . ." The court summarized the similarities in the hair styles and the eyebrows of the subjects. The trial court resolved the conflict in the evidence and found that petitioner's photograph itself, in which petitioner's teeth are showing, was "probably . . . suggestive," but "not overly suggestive" or "impermissibly tainted." *See State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (holding that "questions regarding witness credibility, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact"). We will uphold a trial court's findings of fact in a hearing on a motion to suppress evidence unless the evidence preponderates against those findings. *Scarborough*, 201 S.W.3d at 615 (citing *State v. Cox*, 171 S.W.3d 174, 178 (Tenn. 2005)).

We agree with the trial court's finding that petitioner's photograph may have been suggestive but was not overly or impermissibly suggestive. Applying the *Neil* factors, the evidence established that Ms. Stewart had an ample opportunity to view petitioner at the time of the crime and was fully attentive, describing in detail the events that took place. Ms. Stewart testified at trial that she saw petitioner "park his car on the street, exit the car carrying a gun, walk in front of his car, approach the intended victim, and point the gun at him." *Tony Curtis Holmes*, 2009 WL 3047007, at *1. She also saw petitioner fire the gun, shoot the victim in the chest, and flee the scene. *Id.* Moreover, Ms. Stewart did not need to give law enforcement a description of petitioner; she knew him and knew his name. She testified that "she had known the defendant for twenty years and had no doubt about his identity." *Id.* She specifically identified him to the police. Ms. Stewart reviewed the photographic line-up on the same day that the offenses occurred. She testified at the suppression hearing that it took her "about a second" to identify petitioner as the shooter. Finally, Ms. Stewart testified that she did not choose petitioner's photograph because he was the only person smiling in the array and that no one told her that other witnesses had chosen petitioner's photograph as being the offender. Having reviewed the testimony at the suppression hearing and the record at trial, we conclude that had appellate counsel raised the issue regarding Ms. Stewart's out-of-court identification of petitioner through a photographic line-up on appeal, it would not have resulted in relief.

Petitioner also claims that the trial court should have suppressed Ms. Stewart's in-court identification of petitioner. The trial court found that even if the photograph of petitioner was overly suggestive, Ms. Stewart made an independent and reliable identification

of petitioner based on her observations at the crime scene and her knowledge of petitioner. We agree. The trial court properly allowed Ms. Stewart's trial testimony in full.

## C. Improper Personal Attacks against Prosecutor during Closing Arguments

In his closing argument to the jury, trial counsel zealously represented petitioner and in doing so, made personal remarks against the prosecutor. In retrospect, at the post-conviction hearing, trial counsel testified that he regretted the remarks, stating that he should not have engaged in personal attacks. However, he stated that the direction of his closing argument would not have been different. Post-conviction counsel argues on appeal that "it is more likely than not that the jury, upon hearing the barrage of personal attacks, was unable to focus on lead counsel's arguments pertaining to the problems with the identification testimony." He further asserts that trial counsel's arguments "probably fell on deaf ears."

The post-conviction court found that trial counsel's remarks to the jury would not have impacted the jury. Addressing the deficiency prong of the *Strickland* analysis, we borrow language from our opinion in *Hanson Lee Davis, Jr.,* 1992 WL 69655, at *2: "[M]embers of the jury may be offended by counsel's arguments, but it is most unlikely that they would penalize a defendant and find him guilty of very serious offenses simply because his lawyer made [an unwise] argument." Likewise, counsel has not directed this court to a case in which trial counsel was deemed ineffective for making a regrettable or offensive closing argument. We decline to find that counsel's performance was deficient in this regard.

Moreover, petitioner has not shown that he was prejudiced by trial counsel's closing argument. We conclude that petitioner's counsel did not render ineffective assistance of counsel with regard to this claim.

## D. Failure to Impeach Witnesses Using Prior Criminal Records

At the post-conviction hearing, trial counsel and co-counsel testified about their reasons for not impeaching the testimony of witnesses Ms. Stewart and Mr. Jones. They testified consistently that they knew about the prior misdemeanor theft convictions for each witness, but decided not to impeach the witnesses. They testified that the convictions were nine years old and that impeaching the witnesses would not further their defense of petitioner. Their strategy was to demonstrate that the witnesses were mistaken in their identification of petitioner, not that they were lying about their identification. To that end, the trial record reflects that they presented expert testimony about the fallibility of eyewitness testimony. *See Tony Curtis Holmes*, 2009 WL 3047007, at *2.

The post-conviction court credited the attorneys' strategic decision, finding that impeaching the witnesses would not have changed the outcome of the trial. We agree. Trial counsel clearly had a strategy for handling witnesses and made the informed decision not to impeach them with stale, albeit arguably admissible, misdemeanor theft convictions. In post-conviction proceedings, "the petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." *Dellinger*, 279 S.W.3d at 295 (quoting *Thompson v. State*, 958 S.W.2d 156, 162 (Tenn. Crim. App. 1997)); s*ee also James Young v. State*, No. W2008-00303-CCA-R3-PC, 2009 WL 3047008, at *5 (Tenn. Crim. App. Sept. 24, 2009) (noting that petitioner has not demonstrated trial counsel's actions to be deficient or prejudicial therefrom regarding his failure to impeach the witness) *perm. app. denied* (Tenn. March 15, 2010). Petitioner is not entitled to relief on this claim.

### E. Failure to Impeach Witness with Prior Inconsistent Statement

When police initially arrived at the crime scene, Ms. Stewart, an eyewitness, told them she did not know anything about the shooting. While they were still at the scene, she admitted to law enforcement that she did, indeed, have information about the shooting. Both at the suppression hearing and at trial, Ms. Stewart freely admitted that she first told police that she did not know anything about the shooting, and she explained what she meant and why she said it.

Post-conviction counsel maintains that clearer questioning of Ms. Stewart at trial would have had more of an impact on the jury. Trial counsel asked Ms. Stewart, before the jury, "Did you tell the police officers that arrived at the scene that you didn't know anything about the shooting?" Ms. Stewart answered, "I didn't know the reason for it. I didn't know the reason." He later asked, "At first you told officers that 'I don't know anything about this.' Isn't that right?" She responded, "Right. Right." He asked her, "Was that a lie?," to which she said, "No, it's not a lie." Trial counsel continued, "Because you don't know anything about this shooting, is that right?" Ms. Stewart again clarified, "I don't know the *reason* for it, no." (emphasis added)

Petitioner claims on appeal that a more clear question, such as "[D]idn't you tell the officers on the scene you did not know the shooter?," would have been more effective. Reasonable attorneys could differ in how to phrase a question. We will not find that trial counsel's performance was deficient because he used different syntax than post-conviction counsel would have used. Trial counsel questioned Ms. Stewart fully regarding the circumstances surrounding her initial statement to police. Because she admitted the inconsistency, he was precluded from further impeaching her.

Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement. The unequivocal admission of a prior statement renders the extrinsic evidence both cumulative and consistent with a statement made by the witness during trial. Extrinsic evidence of a prior consistent statement is generally inadmissible . . . .

*State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998) (internal citations omitted). Trial counsel's questioning of Ms. Stewart was not deficient. The jury had before it evidence that Ms. Stewart initially gave a misleading statement to police. No prejudice accrued to petitioner as a result of counsel's performance on this issue.

## F. Claims Abandoned on Appeal

Petitioner raised the following issues in his amended petition for post-conviction relief but did not argue them on appeal:

(1)    Trial counsel was ineffective for failing to obtain Mr. McGory's statement to law enforcement;

(2)    Trial counsel was ineffective for failing to lodge a hearsay objection to Ms. Stewart's testimony regarding "snitches" in the community;

(3)    Trial counsel was ineffective for failing to adequately meet with and communicate with petitioner;

(4)    Trial counsel was ineffective for advising petitioner not to testify at trial;

(5)    Trial counsel was ineffective for failing to present all witnesses who could have supported the defense theory of the case; and

(6)    Trial counsel was ineffective for failing to adequately investigate the case.

Petitioner presented evidence at the evidentiary hearing with respect to each of these six issues. By failing to argue these issues on appeal, petitioner has effectively abandoned these claims for further review. *See Ronnie Jackson, Jr. v. State*, No. W2008-02280-CCA-R3-PC, 2009 WL 3430151, at *6 n.2 (Tenn. Crim. App. Oct. 26, 2009) ("[w]hile the Petitioner raised

additional issues in his petition for post-conviction relief, he has abandoned those issues on appeal").

## IV.  Conclusion

After reviewing the record, the parties' briefs, and the applicable law, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE