IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 14, 2012

## STATE OF TENNESSEE v. TOMARIO WALTON
## a.k.a. QUADRICUS DEAN

**Appeal from the Criminal Court for Shelby County**
**No. 09-07601     Paula Skahan, Judge**

_____

**No. W2011-01082-CCA-R3-CD  - Filed August 6, 2012**

_____

A Shelby County jury convicted the Defendant-Appellant, Tomario Walton a.k.a. Quadricus Dean, of aggravated robbery, a Class B felony.  He was sentenced as a Range I, standard offender to a nine-year term of imprisonment in the Tennessee Department of Correction. On appeal, Walton presents the following issues for our review: (1) whether the trial court erred in denying his motion to suppress the victim's showup identification of him as the perpetrator of the offense, and (2) whether the evidence at trial, specifically that of Walton's identity, was sufficient to support the jury's verdict.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and JOHN EVERETT WILLIAMS, J., joined.

James M. Gulley, Memphis, Tennessee, for the Defendant-Appellant, Tomario Walton.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Amy P. Weirich, District Attorney General; Glen C. Baity and Bryan Davis, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

The facts of this case stem from the armed robbery of Sheila Ray, the victim, by Walton and his co-defendant, Jasper Clayton.  Within an hour of the offense, Walton and Clayton were apprehended within two miles of the offense location.  The victim was taken to that location, asked if the perpetrators were present, and identified Walton as the gunman.

Prior to trial, Walton filed a motion to suppress the showup identification, as a violation of his due process rights.

At the motion to suppress hearing, held on July 2 and July 15, 2010, the victim testified that she was robbed at her apartment complex on August 18, 2009. At approximately 5:15 p.m., she drove into her parking lot, exited her car, and observed two African American men. As she attempted to walk past the men, one of them "walked up to [her] and held a gun on [her]." Asked whether the individual who held the gun on her was present in court, she replied, "I can't be sure so I'd say no." The victim continued and explained that the perpetrator was "within the distance of me and the Judge," that he held the gun to her face, and that the robbery lasted about thirty seconds to a minute. She recalled that the man with the gun was wearing a white T-shirt and jeans, while the other man was not wearing a shirt. After demanding the victim's bags, the gunman "just took them" and both men "took off running."

The victim drove to the apartment complex office, where the office manager called the police. The office manager had seen the two men "take off" and obtained the license plate number. Within ten minutes, the police arrived at the apartment complex and spoke with the victim. Thirty to forty-five minutes later, the victim followed the police to the location where they had stopped two men driving a car matching the license plate number given by the office manager, approximately one and one-half to two miles away from the scene of the robbery. Once at the location, the police requested the victim to exit her car and "look around" to determine if the perpetrators were present. The victim explained that, at that time, she observed two men standing outside the police car along with several other police officers. She could not tell whether the two men were handcuffed. The victim was talking to one police officer but was not given any suggestions as to whom she should "pick out" as the perpetrators. Although not asked directly whether she identified the two men standing outside the police car as the perpetrators of the offense at the hearing, the victim testified that, while on the scene, she was certain that the two men were the individuals who robbed her because it was "fresh" in her mind at that time.

On cross-examination, the victim agreed that, prior to arriving at the location where the two men were apprehended, she was told by the police that "they actually stopped two black males in the vehicle . . . matching that description with that license plate." She further agreed that the two men were the only men in "regular clothing on the scene." The victim also testified that she was unable to identify anyone as the perpetrator of the instant offense at the preliminary hearing.

Corey Hentz, an officer with the Memphis Police Department, responded to the instant offense. He spoke with the victim, who provided him with a description of the suspects and

a description of the vehicle with the tag number. The victim told Officer Hentz that two individuals were involved with the robbery. She described the armed suspect as a "male black with a white T-shirt on . . . dark colored jeans." She also said that the suspects were driving a black pickup truck. This information was relayed to other officers in the area. Officer Hentz explained that the other officers stopped the suspect truck at a second location, Mingle and Berrybrook. Within thirty minutes of speaking to the victim, Officer Hentz went to the second location and requested the victim to follow him.

Officer Hentz testified that the victim identified Walton at the second location as the perpetrator of the offense. He explained the process by which the victim identified Walton. Officer Hentz said that both suspects were in two separate police cars. They brought the victim over and "stood each suspect up one at a time and she identified the one who robbed her with a pistol and took her belongings." The victim was approximately 100 feet from the suspects when she identified Walton. Officer Hentz testified that he did not do anything to suggest to the victim that she should pick either of the suspects. He also did not observe any other officer suggest anything to her.

Dennis Williams, Jr., a Memphis Police officer, said he saw a truck that matched the description given by a person who was "just robbed" westbound on Shelby Drive toward Hickory Hill. He verified the tag number, advised other police officers of his location, and called for assistance. Upon arrival of other police assistance, he signaled for the suspect truck to stop at Mingle and Berrybrook. The suspect truck complied "within a quarter of a mile." Over his speaker system, he ordered the two occupants of the truck to turn the truck off and exit with their hands in the air. The occupants complied. Officer Williams observed that the passenger, later identified as Walton, matched the description previously provided to him by the dispatcher. Another officer placed the suspects in handcuffs, and they were patted down and placed in separate squad cars.

Officer Williams approached the truck, looked inside, noticed "a lot of papers and IDs thrown around the inside the cab of the vehicle." He found the victim's driver's license on the floorboard and credit cards, purse and cell phone strewn about the cab of the truck. He then notified dispatch. Although he saw the victim on the scene, he had no communication with her. He recalled that the driver had identification with him, but Walton did not. Officer Williams recorded the information in his report and called for his supervisor.

By written order, the trial court denied the motion to suppress. The court concluded that the showup identification procedure was not unnecessarily suggestive and that the identification was reliable under the totality of the circumstances.

**Trial**. At trial, the victim testified consistently with her testimony at the motion to suppress hearing. Additionally, the victim testified that as she walked toward the two men, the shorter of the two men stepped off the sidewalk and toward her. Holding a pistol at his side, he said, "[G]ive me your things." The victim asked, "[A]re you serious?" The man replied, "Yeah, I'm serious," and pointed the gun, which the victim described as "small," "silver," and "not a revolver," at her. The victim began to give the man her things, but he took them from her before she had a chance. He then took her phone out of her pocket despite the victim's plea to leave it. The man told her not to "make a sound [or] move," and both men fled into the breezeway and down stairs leading to basement apartments and another parking lot.

The victim returned to her car and drove to the apartment complex leasing office. At the office, Madonna Fulgham, the property manager for the apartment complex, allowed the victim to use a telephone to call 911. Ms. Fulgham also spoke with the 911 dispatcher and provided a license plate number of a vehicle she saw.[1] A police officer arrived at the apartments approximately ten minutes later and interviewed the victim. The victim waited for a friend to arrive to give her a ride and then followed the police officer. Although she thought they were going downtown so she could provide a statement, they instead went to another location where she identified the men who robbed her. The officers had the victim get out of her car and asked her whether she saw the men. They showed the men to her separately, and she was able to distinguish between the man who had a gun and the man who was talking on a cell phone. The victim testified that this identification occurred between thirty minutes and an hour after the robbery. She was able to identify the gunman because her memory of him was still fresh. She was certain of her identification at the time, and she based it on his clothing, jeans and a white t-shirt.

The victim viewed photographs, admitted as exhibits at trial, that depicted the interior of the pickup truck in which Walton was apprehended. She identified several items in the truck, which were taken from her during the robbery. Those items included her driver's license, debit card, purse, tote bag, and lunch bag. She recovered everything that the robber took from her except the cash she had in her purse.

On cross-examination, the victim testified that she got a good look at the gunman. She testified that there was nothing unusual or distinct about his appearance, and he had "[n]o mohawk, no long hair, no earrings that [she] could tell." The other man was "clearly

---

[1] A recording of the 911 call was played for the jury and admitted as an exhibit at trial. Although it was included in the record on appeal, the recording is of such poor quality that it is largely unintelligible. The victim can be heard describing what happened and the appearance of the robbers, but we cannot discern the details of those descriptions.

taller" than the gunman. She testified that although she first thought that the taller man was wearing a black t-shirt, he actually was shirtless. Before the police requested that she identify the men, they told her that "they had pulled over two suspects and that what they thought were [her] things were there." The victim testified that she was unable to identify Walton as the gunman at a preliminary hearing held approximately forty-five days after the robbery. She also could not identify him at trial, approximately one year and five months after the robbery. She testified, "I saw the gun more, I mean, I was looking at the gun, you know, a lot . . . ."

The victim also identified a gun similar in shape and size to the one that was used in the robbery. She further identified and confirmed that her purse, a bag that she carried to and from work, her cell phone and blue tooth were taken during the robbery. She described her emotional state during the robbery as "shocked" and "scared." As the 911 tape was played for the jury, the victim identified her voice and the voice of the office manager. She identified exhibits of the apartment parking lot layout, which facilitated her description of where she was when the offense occurred.

Madonna Fulgham, the property manager for the apartments where the robbery occurred, testified that on the day of the offense she received a call about two suspicious people loitering around an apartment building. She called security and requested that they respond. Later that same day, Ms. Fulgham showed a model home to prospective renters. As she was leaving that home, two men whom she did not recognize, jogged past her, almost running into her. The men were black and appeared "to be in their late teens, early twenties." Ms. Fulgham followed the men to the parking lot, where she saw them get into a pickup truck that had been backed into a parking space. She noted the license plate number and walked to her office. As she reached the office, the victim arrived in her car and said that she had just been robbed at gunpoint. They went inside the office and called 911. Ms. Fulgham informed the dispatcher of the pickup truck's license plate number.

On cross-examination, Ms. Fulgham testified that there was nothing unusual about the men's appearance. She was suspicious of them based on their "mannerism[s] and the pace of coming through that particular corridor at that particular time of the day."

Jasper Clayton testified that he was with Walton when the instant offense occurred and identified Walton, at trial, as the person with him. Clayton said Walton's nickname was "Quadricus," and that they "used to hang out back in the day." He gave Walton a ride earlier in the day on the date of the offense, not realizing where they were going or that a robbery was about to occur. Clayton was driving his father's truck, a black Toyota Tacoma. They drove to an apartment complex and saw a white female. Walton was armed with a chrome pistol. Clayton said Walton approached the female, but Clayton could not recall Walton's

exact words to her. Clayton said, however, that Walton pointed a gun at the female and demanded her property. Clayton said Walton grabbed her bags and they "struck out running." Clayton said that Walton had a mohawk haircut on the day of the offense, but was wearing a do-rag.

Clayton confirmed that he was stopped by the police soon after the offense and that Walton was the passenger in his truck. He further confirmed that the weapon used in the robbery was recovered from his father's truck. For his involvement with this case, Clayton was charged with and pled guilty to facilitating an aggravated robbery, a Class C felony. The specifics of his sentence were not detailed; however, he received "diversion" for this offense. He did not receive a reduced charge or any promises or deals in exchange for his truthful testimony at trial.

Officer Dennis Williams of the Memphis Police Department testified consistently with his testimony at the motion to suppress hearing. Additionally, Officer Williams said he stopped the suspect truck at the second location at 6 p.m., between two and one-half and three and one-half miles from the scene of the robbery. Officer Williams testified that, upon his initial interaction with Walton, Walton was "very uncooperative" and provided several different names. The officers searched the truck and found "the victim's . . . wallet, purse and just items thrown all over the truck[,] [a]nd just various credit cards and just a lot of personal items that wasn't [sic] the driver's or the passenger's items." The officers located a pistol under the driver's seat of the truck, which was admitted as an exhibit at trial along with photographs of the pistol in the truck. Officer Williams testified that when the victim was at the second location, she identified Walton as the gunman who robbed her.

Officer Corey Hentz of the Memphis Police Department testified consistently with his testimony at the motion to suppress hearing. Additionally, he testified that the victim identified Walton as the man who robbed her at gunpoint and that she was "fairly certain" at the time that she had correctly identified the gunman.

Shirley Tipler, an employee of the jail property room, identified a white shirt and jeans as property belonging to Walton at the time he was booked at the jail. The clothes were admitted as an exhibit at trial.

The jury convicted Walton of aggravated robbery. This timely appeal followed.

**ANALYSIS**

**I. Victim's Identification of Defendant.** On appeal, Walton contends that the trial court erred in admitting the victim's showup identification of him. He asserts that showups

in general are inherently suggestive and that the specific showup in this case was especially suggestive because Walton was pulled out of a police car when the victim viewed him and because the police told the victim that Walton was stopped in a truck that contained her stolen belongings. Walton argues that the showup was unnecessary because the police could have easily arranged for a station house lineup. He further argues that under the totality of the circumstances, the identification was unreliable because (1) the victim was paying attention to the gun rather than the robber's identity, (2) the victim's description of the robber did not match Walton, (3) the victim was one hundred feet from Walton when she viewed and identified him, and (4) the victim could not identify Walton at later court proceedings. The State, in response, concedes that the showup was suggestive but contends that it was not unnecessarily suggestive. It additionally argues that the circumstances of the identification demonstrate its reliability and that the trial court did not err in admitting the identification at trial. We agree with the State that the trial court properly admitted the identification testimony at trial.

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). In conducting our review, it is a settled principle that "[f]indings of fact made by the trial judge after an evidentiary hearing of a motion to suppress are afforded the weight of a jury verdict, and this court will not set aside the trial court's judgment unless the evidence contained in the record preponderates against his findings." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996) (quoting State v. Adams, 859 S.W.2d 359, 362 (Tenn. Crim. App. 1992)). In addition, the Tennessee Supreme Court has stated:

> Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact. The party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld. In other words, a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise.

Id. at 23. A trial court's conclusions of law, however, are reviewed de novo. State v. Carter, 160 S.W.3d 526, 531 (Tenn. 2005) (citing State v. Daniel, 12 S.W.3d 420, 423 (Tenn. 2000)).

An out-of-court identification violates a defendant's due process rights when it is "unnecessarily suggestive"[2] and raises "'a very substantial likelihood of . . . misidentification.'"[3] Neil v. Biggers, 409 U.S. 188, 198 (1972) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). The United States Supreme Court has explained, "It is the likelihood of misidentification which violates a defendant's right to due process . . . . Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." Id. A trial court therefore must determine the validity of a pretrial identification according to a two-part analysis. Id. at 198-200. First, the trial court must determine whether the identification procedure was unnecessarily suggestive. Id. at 198. Next, if the trial court determines that the identification procedure was unnecessarily suggestive, it must then consider whether, under the totality of the circumstances, the identification procedure was nonetheless reliable and therefore satisfied due process despite the suggestiveness. Id. at 199; State v. Scarborough, 300 S.W.3d 717, 730 (Tenn. Crim. App. 2009). Several factors are relevant in assessing the reliability of the identification:

[(1)] the opportunity of the witness to view the criminal at the time of the crime, [(2)] the witness' degree of attention, [(3)] the accuracy of the witness' prior description of the criminal, [(4)] the level of certainty demonstrated by the witness at the confrontation, and [(5)] the length of time between the crime and the confrontation.

Biggers, 409 U.S. at 199-200.

A showup, a "one-on-one confrontation" that "occurs when 'a single person is presented as a suspect to a viewing witness,'" is a particular type of out-of-court identification procedure. State v. Thomas, 780 S.W.2d 379, 381 n.1 (Tenn. Crim. App. 1989) (quoting United States v. Sanders, 547 F.2d 1037, 1040 (8th Cir. 1976)). Courts generally condemn the use of a showup because it is often suggestive and unfair to the

---

[2] Tennessee courts have sometimes applied the standard of "unduly suggestive" rather than "unnecessarily suggestive" although the latter is the language used in Biggers. See State v. Albert W. Bentley, No. M2010-01882-CCA-R3-CD, 2011 WL 6916762, at *8 (Tenn. Crim. App., at Nashville, Dec. 29, 2011) (Tipton, P.J., concurring).

[3] As Biggers explains, this standard for assessing in-court testimony regarding an out-of-court identification is a modified version of the standard applicable to an in-court identification following a suggestive out-of-court identification. 409 U.S. at 198. Such an in-court identification is assessed by considering whether the identification procedure created "a very substantial likelihood of irreparable misidentification." Id. (citing Simmons, 390 U.S. at 384).

suspect. Id. at 381. Nevertheless, a showup is not unnecessarily suggestive when "imperative circumstances necessitate" its use or it occurs "as an on-the-scene investigatory procedure shortly after the commission of the crime." Id. at 381. This court has explained that a showup, when used as an investigatory procedure sufficiently proximate in both time and place to the offense, often serves the interests of justice. State v. Moore, 596 S.W.2d 841, 844 (Tenn. Crim. App. 1980). It can "'foster[] the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh.'" Id. (quoting Bates v. United States, 405 F.2d 1104, 1106 (D.C. Cir. 1968)). A showup identification, therefore, violates due process only when it is unnecessarily suggestive and unreliable.

Here, we conclude that the showup procedure was unnecessarily suggestive. Contrary to Walton's assertions on appeal, the showup procedure by itself was justified as an on-the-scene investigatory procedure. The proof established that immediately after the report of the robbery, the police began searching for the vehicle and the suspects matching the witnesses' descriptions. Less than an hour later and within three and one-half miles of the robbery's occurrence, the police stopped a vehicle and two men that matched the descriptions. The showup that followed was sufficiently close in time and place to the robbery to be considered an on-the-scene investigatory procedure. Nor was the showup unnecessarily suggestive, as Walton asserts, because he exited a police car for the victim to view him. This court has found on numerous occasions that showups with the defendant in or near a police car are not unnecessarily suggestive. See, e.g., State v. Corey Eshmon, No. W2008-00109-CCA-R3-CD, 2009 WL 3029670, at *3, 10 (Tenn. Crim. App., at Jackson, Sept. 23, 2009) (declining to hold a showup unnecessarily suggestive when the defendant was seated in the backseat of a police car for the victim to view him); State v. Vidal L. Strickland, No. M2002-01714-CCA-R3-CD, 2003 WL 22243440, at *13 (Tenn. Crim. App., at Nashville, Sept. 30, 2003) (declining to hold a showup unnecessarily suggestive when the defendant was pulled out of a police car and made to stand by it for the victims to view him), perm. app. denied (Tenn. Oct 17, 2005). However, the police improperly and unnecessarily added to the showup's inherent suggestiveness by telling the victim that the subject of the showup was found with her stolen property in a vehicle matching Ms. Fulgham's description. Such a communication to the victim before the showup led to a "[gratuitous] increased chance of misidentification." Biggers, 409 U.S. at 198. See State v. Cory Shane Rollins, No. E2008-01407-CCA-R3-CD, 2010 WL 342653, at *2, 4 (Tenn. Crim. App., at Knoxville, Feb. 1, 2010) (finding a showup unduly suggestive in part because police gave the victim "periodic updates of the police chase" of a vehicle matching witnesses' descriptions and told her before the showup that "'this was possibly the suspect that had committed the robbery'"), perm. app. denied (Tenn. June 17, 2010). As a result, the identification procedure was unnecessarily suggestive.

Having found the showup unnecessarily suggestive, we must consider whether the totality of the circumstances under the Biggers factors indicates that the identification was reliable despite the unnecessary suggestiveness of the showup. First, the victim had substantial opportunity to view Walton at the time of the crime. She testified that the robbery occurred in daylight and that she faced Walton at close quarters for the duration of the robbery, between thirty and sixty seconds. See Scarborough, 300 S.W.3d at 729 (ruling that the victim's opportunity to view the defendant for fifteen to thirty seconds supported a reliable identification). Additionally, she observed Walton as she drove into the apartment parking lot before the robbery occurred. Second, the victim's testimony indicates that she was attentive during the robbery. Her ability to recall what the men were doing as she approached them, their appearance, and the words she exchanged with Walton demonstrates her heightened degree of attention at the time. Although the victim paid attention to the gun Walton pointed at her, that fact alone does not suggest, as Walton argues, that she was not also attentive to Walton's identifiable features. Third, the victim provided an accurate description of Walton before the showup. She described the appearance of the gunman and his clothing, jeans and a white t-shirt, which matched Walton. Although she did not describe Walton's mohawk, Clayton testified that Walton wore a do-rag at the time of the robbery. We recognize that the victim's prior description was not excessively detailed, but on balance it favors the reliability of the identification. Fourth, the victim testified that she quickly identified Walton and that she based her identification on his face and his clothing, which she recalled from the events of the robbery. She assessed her confidence in the identification at the time as "sure" and "certain." Fifth, the short length of time, thirty minutes to one hour, between the crime and the identification further supports its reliability. See Wadley v. State, 634 S.W.2d 658, 662-63 (Tenn. Crim. App. 1982) (finding reliability when "only" seven days passed between crime and identification).

Aside from the Biggers factors, Walton asserts that other circumstances undermined the reliability of the identification. He argues that the distance at which the victim viewed Walton during the showup renders it unreliable. However, the witnesses testified that the victim was between thirty and one hundred feet from Walton when she identified him as the gunman. This distance was not excessive and was conducive to an accurate identification, as evidenced by the victim's ability to see Walton's face and clothing well enough to quickly and easily identify him. Walton additionally argues that the victim's inability to identify him at any court proceeding calls into question the reliability of the identification. The victim explained, however, that she was able to identify Walton at the showup on the day of the offense because her memory of the robber was fresh and that this was not the case at the later court proceedings, suggesting that her memory faded with the passage of time. This explanation is reasonable under the circumstances, and the victim's inability to identify Walton in court does not render the out-of-court identification unreliable. See State v. Biggs, 211 S.W.3d 744, 747, 751-52 (Tenn. Crim. App. 2006) (finding an officer's photographic

showup identification two months after the offense reliable under the totality of the circumstances even though the officer could not identify the defendant at trial); State v. Jason A. Laws, No. 03C01-9509-CC-00289, 1996 WL 168701, at *3 (Tenn. Crim. App., at Knoxville, Apr. 11, 1996) (finding a victim's photographic lineup identification one day after the offense reliable under the totality of the circumstances even though the victim could not identify the defendant at trial). We conclude, therefore, that under the totality of the circumstances, even when viewed in light of the unnecessary suggestiveness of the showup procedure, there is not "'a very substantial likelihood of . . . misidentification.'" Biggers, 409 U.S. at 198 (quoting Simmons, 390 U.S. at 384). As the Supreme Court has said, "Short of that point, such evidence is for the jury to weigh." Manson v. Brathwaite, 432 U.S. 98, 116 (1977). Consequently, the trial court did not err in admitting this evidence at trial, and Walton is not entitled to relief.

**II. Sufficiency of the Evidence.** Walton argues that the evidence introduced at trial is insufficient to support his conviction for aggravated robbery. Specifically, he asserts that the State failed to prove Walton's identity as the gunman. He relies on the suggestiveness of the showup identification procedure, the victim's testimony that the gunman had no mohawk, and the fact that the police found the pistol under the driver's seat of the pickup truck where Clayton was sitting. The State responds, and we agree, that the evidence is sufficient to support Walton's conviction.

The State, on appeal, is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from the evidence. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). When a defendant challenges the sufficiency of the evidence, this court must decide "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Similarly, Rule 13(e) of the Tennessee Rules of Appellate Procedure states, "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support a finding by the trier of fact of guilt beyond a reasonable doubt."

A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt; therefore, a defendant on appeal has the burden of showing that the evidence is insufficient to support the jury's verdict. State v. Thacker, 164 S.W.3d 208, 221 (Tenn. 2005) (citing State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982)). A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in the State's favor. Bland, 958 S.W.2d at 659 (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Issues regarding the credibility of witnesses, the weight and value of the evidence, and all factual issues raised

by the evidence are resolved by the jury as the trier of fact, and this court does not reweigh or reevaluate the evidence. Id. (citing State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978)). Guilt may be found beyond a reasonable doubt in a case where there is direct evidence, circumstantial evidence, or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing State v. Brown, 551 S.W.2d 329, 331 (Tenn. 1977); Farmer v. State, 343 S.W.2d 895, 897 (Tenn. 1961)).

"The identity of the perpetrator is an essential element of any crime." State v. Robert Wayne Pryor, No. M2003-02981-CCA-R3-CD, 2005 WL 901140, at *3 (Tenn. Crim. App., at Nashville, Apr. 19, 2005) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)). The State has the burden of proving "the identity of the defendant as the perpetrator beyond a reasonable doubt." Id. (citing State v. Sneed, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995)). The identity of the defendant as the perpetrator, just like guilt generally, may be established by direct evidence, circumstantial evidence, or a combination of the two. Thompson, 519 S.W.2d at 793. "The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999) (citing State v. Strickland, 885 S.W.2d 85, 87-88 (Tenn. Crim. App. 1993)). This court has stated that the identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof. Strickland, 885 S.W.2d at 87 (citing State v. Crawford, 635 S.W.2d 704, 705 (Tenn. Crim. App. 1982)). In addition, this court has held that "the testimony of a victim, by itself, is sufficient to support a conviction." Id. (citing State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981)).

To convict Walton of aggravated robbery, the State was required to prove that he used a deadly weapon to commit an "intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. §§ 39-13-401, -402 (2010). Here, the evidence supports the jury's verdict. The issue of identity was prominently contested throughout trial. Walton extensively cross-examined the victim and Officers Williams and Hentz regarding the identification procedure and the victim's identification of Walton as the perpetrator of the aggravated robbery. Although the victim did not identify Walton at trial, she testified that she was confident in her identification of him at the showup. The parties also elicited substantial testimony that the victim viewed the gunman face-to-face in close proximity during daylight hours, circumstances that would permit a positive identification. Furthermore, Clayton testified, consistently with the victim's account, that he witnessed Walton approach the victim, point a gun at her, and steal her belongings. Finally, Walton was stopped, within an hour and three and one-half miles of the offense, while riding in the pickup truck Ms. Fulgham saw leave the scene. The truck contained not only the victim's stolen possessions but also a pistol matching the victim's description of the one the gunman pointed at her during the robbery. All of Walton's arguments in support of this issue were

presented to, and rejected by, the jury.  As we previously stated, it is for the jury and not this court to decide what weight to give the evidence and to determine the credibility of the witnesses.  Based on the trial evidence, a rational trier of fact could have found Walton guilty beyond a reasonable doubt of aggravated robbery.  He is not entitled to relief on this issue.

## CONCLUSION

Upon review, we affirm the judgment of the trial court.


_____
CAMILLE R. McMULLEN, JUDGE