# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 10, 2013 Session

## STATE OF TENNESSEE v. BRYAN WILLIAMS

**Appeal from the Circuit Court for Gibson County**
**Nos. 18734, 18735, & 18736      Clayburn L. Peeples, Judge**

---

**No. W2013-00418-CCA-R3-CD  - Filed January 24, 2014**

---

Following a jury trial, the Defendant, Bryan Williams, was convicted of two counts of aggravated rape, a Class A felony; two counts of especially aggravated kidnapping, a Class A felony; aggravated kidnapping, a Class B felony; four counts of aggravated burglary, a Class C felony; aggravated assault, a Class C felony; ten counts of felony violation of community supervision conditions, a Class E felony; six counts of misdemeanor violation of community supervision conditions, a Class A misdemeanor; simple possession of marijuana, a Class A misdemeanor; and indecent exposure, a Class B misdemeanor.  See Tenn. Code Ann. §§ 39-13-102, -13-304, -13-305, -13-502, -13-511, -13-526, -14-403, -17-418.  The trial court imposed an effective sentence of sixty-two years to be served at one hundred percent.  On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; (2) that the rape victims were actually accomplices to the crimes and that their testimony was uncorroborated; (3) that the State was allowed to reopen its proof to the prejudice of the Defendant; (4) that the State raised issues in its rebuttal argument that had not been raised in the Defendant's closing argument; and (5) that the Defendant "was sentenced improperly."  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and JAMES CURWOOD WITT, JR., JJ., joined.

Harold R. Gunn, Humboldt, Tennessee, for the appellant, Bryan Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Garry G. Brown, District Attorney General; Edward L. Hardister and Hillary Lawler Parham, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTUAL BACKGROUND

At approximately 3:00 a.m. on the morning of August 25, 2010, F.W.[1] awoke to a "banging" sound in her apartment in Milan, Tennessee. When F.W. went to investigate the noise, she discovered that her cell phone was missing and that a light she had left on in her living room had been turned off. As F.W. turned around to go back to her bedroom, she saw a naked African-American man "standing in front of [her] bathroom." F.W. screamed and the man charged her, knocking her over a chair and putting his hand over her mouth. F.W. tried to fight the man off, but he told her that he had a knife and would kill her if she screamed again. The man showed F.W. the knife and claimed that he had been "sent there to kill [her] by someone" but that he was not going to go through with it because her children were asleep in the apartment.

The man told F.W. that as a show of gratitude for not killing her, she was going to perform fellatio on him. While holding the knife, the man told F.W. to "get down and suck his d--k." F.W. complied with the man's demand. The man told F.W. to "keep [her] hands to where he could see them so [she] couldn't do anything stupid." At one point while F.W. was performing fellatio, F.W.'s three-year-old daughter woke up. The man told F.W. that she "better get her back in bed," and F.W. screamed at her daughter until she went back into the bedroom. F.W. was afraid that the man "was going to hurt [her] and [then her] kids would be left alone with a monster." The man also made F.W. "unlock" her cell phone so "he could watch movies" while she performed fellatio.

The man stopped F.W. and made her lay her head on his chest while he smoked a cigarette. He told her "that he knew that [she] was a good mother and that [she] loved [her] children." He also told her that she "shouldn't sleep so soundly with children in the house, because he had been in [her] house for an hour" before she woke up. The man then made F.W. resume performing fellatio. He ejaculated, ordered her "to spit it back out on a towel," and made her wash her mouth and hands with bleach. The man told F.W. that he would kill her and hurt her children if she ever told anyone about what happened. The man dressed and took the towel and cigarette butt with him as he left. F.W. woke her children up and took them to a babysitter. She then went to work where she "just completely lost it." A co-worker took F.W. to the local hospital, and she reported the rape to the police. The police were unable to identify the perpetrator at the time.

---

[1]It is the policy of this court to refer to victims of rape by their initials.

At approximately 4:45 a.m. on July 22, 2011, Cassandra Shultz was walking to her job at a gas station in Milan when she saw a man approaching her. The man had on a black "hoodie" and no pants. The man was "fondling himself" and said to Ms. Shultz, "You know you want this." He then began laughing hysterically. Ms. Shultz was "real shook-up" by the incident and called the police. One of the gas station customers suggested that it had been the Defendant who had exposed himself to Ms. Shultz. When police went to the Defendant's home, they found a black hoodie matching Ms. Shultz's description and the video of the incident from the gas station's surveillance camera. The Defendant admitted to going to the gas station, but he claimed that he "was trying just to scare" Ms. Shultz. Ms. Shultz was subsequently able to identify the Defendant as the man who exposed himself to her.

The Defendant had been placed on community supervision for life in September 2009 as a consequence of a prior conviction for attempted aggravated sexual battery. As part of the conditions of the Defendant's community supervision, he was barred from using pornography, drugs, or alcohol. The Defendant was also required to stay in his home between the hours of 10:00 p.m and 6:00 a.m. As a result of the Defendant's arrest for indecent exposure, he was placed on Global Positioning System (GPS) monitoring and given a GPS bracelet to be worn around his ankle at all times. At 1:40 a.m. on November 7, 2011, Probation and Parole Officer Jeff Jackson received a "master tamper" call that the Defendant's GPS bracelet had been removed or damaged. Officer Jackson called the Defendant, but he did not answer his phone.

At 2:15 a.m. that morning, the Milan Police Department (MPD) received a report of a rape at a home on Shepherd Street. A.C., fourteen years old at the time, had been asleep on her living room couch when she woke up to a man standing over her. The man told her that he had a gun, that he did not want to hurt her, and that he "just want[ed] to talk to [her]." The man grabbed A.C.'s arm and pulled her outside the house. The man told A.C. that he was not going to rape her because she was "too young" and reiterated that he "just want[ed] to talk." As the man took her around to the back porch of the house, A.C. noticed that the man had her mother's laptop computer. The man told A.C. that "he was returning" the laptop.

Once on the back porch, the man "pulled down his pants" and put A.C.'s hand on his penis. A.C. began to cry. The man told her that he "was going to have to kill" her if she cried and that she was "lucky" that he did not make her put her mouth on his penis. The man pulled down A.C.'s shirt and bra and said that "he was just looking." He then ordered A.C. to get on her knees and perform fellatio. A.C. "didn't want to" but complied because the man said he would kill her or hurt her family if she did not, and she was afraid he had a gun. The man accused A.C. of not believing that he had a gun and pulled something black out of

his pocket. A.C. did not get a good look at the item because she turned her head in fear when he pulled it out.

At that point, A.C. started to act "like [she] was about to throw up." The man "got frustrated" and asked if she had a sister. When A.C. responded that she did, the man asked her if she thought her sister would perform fellatio on him. A.C. stated that her sister would, hoping that she could get back in the house and alert her parents to what was happening. The man told her that he was going to take her into the house to get her sister and that if she made any noise he would kill her and her family. Once they were back inside the house, A.C. ran screaming into her parents' bedroom. She "jumped" into their bed and told her father to get his gun because there was man in the house going after her sister with a gun. When her father checked the house, the man was gone.

A.C. told her parents that "Bryan" had raped her, and A.C.'s step-mother knew "immediately" that it had been the Defendant. The Defendant's girlfriend lived in a house directly behind A.C.'s, and A.C. was familiar with the Defendant from having seen him from her backyard. A.C. told the police that the Defendant was wearing dark pants and a black hoodie. A.C. also told the police that on November 4, 2011, she had woken up in the morning and saw a man standing in the doorway of her bedroom staring at her and her sister. A.C. had thought that the man was her father, but her father was not in the house at that time. A.C.'s mother's laptop also went missing around the same time. While the police were investigating the incident, A.C.'s mother discovered that the lock on their front door was not working. At trial, A.C. identified the Defendant as the man who had raped her.

At 2:29 a.m. the morning of November 7, 2011, the MPD received the report of a burglary at home on West Woodrow Street, a short distance away from A.C.'s home. Carolyn Gurley was asleep in a bedroom of her mother's house when she awoke to the sound of a dresser being knocked over. When Ms. Gurley opened her eyes, she saw an African-American man "crawling up the bed" towards her. Ms. Gurley kicked the man as hard as she could in his chest. The man fell over and then "dove out the window" when she started screaming. Outside, Ms. Gurley found "a big green garbage can" had been pushed underneath the bedroom window. Ms. Gurley picked the Defendant's picture out of a photographic lineup that morning and at trial identified the Defendant as the man who entered her bedroom.

At 2:53 a.m. the same morning, the MPD received a call from an apartment on North Side Terrace, a short distance from Ms. Gurley's mother's house. Crystal Randle was eight months pregnant at that time and staying at her friend's apartment. Ms. Randle was asleep on the couch when she woke up to someone's arm around her. Ms. Randle heard a man say, "Don't move or I will stab you." Ms. Randle saw a knife in the man's hand and started to

-4-

cry. Ms. Randle told the man that her children were in the bedroom and begged him to leave. The man told her that if she screamed, he would kill her children and "stab [her] in [her] stomach and kill [her] baby." The man put the knife to Ms. Randle's throat and led her out of the apartment.

The man kept the knife to Ms. Randle's throat as they walked outside the apartment building. As they rounded the side of the building, Ms. Randle grabbed the knife and threw it away from the man. Ms. Randle and the man struggled over the knife for a few minutes, and she eventually threw it away from him a second time. Ms. Randle started to scream and the man called her a "f--king b---h" and ran away. Ms. Randle took the knife and went back into the apartment to call the police. During the struggle, Ms. Randle scraped her leg on a brick, causing a large abrasion on her left leg. Police found that the latch on the bathroom window of the apartment was broken and that the "piping" outside the window could be used to climb up to it. At trial, Ms. Randle identified the Defendant as her attacker.

At approximately 3:00 a.m. Officer Jackson arrived in Milan. He drove by the Defendant's house on West Main Street, a few blocks from the victims' homes. Officer Jackson saw that the house "was blacked out." He then drove to the Defendant's girlfriend's house and saw lights on in the house. Officer Jackson went back to the Defendant's home. He and officers from the MPD knocked on the door, but no one answered. The door was open, so Officer Jackson entered the house and woke up the other residents. They told him that the Defendant was asleep in his bedroom. When Officer Jackson entered the Defendant's bedroom, he found the Defendant's GPS bracelet with its strap severed, a knife, the Defendant's cell phone, and the Defendant's Board of Probation and Parole Offender Identification Card which he was "supposed to have [] on him at all times when [he was] not in his residence."

C.E. was a cousin of the Defendant's girlfriend and was staying at the Defendant's girlfriend's house on November 7, 2011. At approximately 3:00 a.m., C.E. heard a knock on the door. C.E. answered the door, let the Defendant into the house, and went back to bed. The Defendant came into the room where C.E. was sleeping and asked her to come out into the living room and talk to him. Once in the living room, C.E. saw that the Defendant had his hand in his pants. The Defendant told C.E. to come sit on the couch because he needed her "to do something" for him. C.E. complied with the Defendant's demand because she "knew he had been violent in the past." The Defendant took out his penis and made C.E. "get on [her] knees to perform fellatio."

C.E. told the Defendant that she did not want to perform fellatio on him, but the Defendant pushed her down by her shoulders. At one point, C.E. screamed for her cousin, but the Defendant put his hands around her neck and asked her if she wanted him "to get

more violent." The Defendant forced C.E. to continue performing fellatio. C.E. noticed that the Defendant was watching pornography on a laptop computer she did not recognize. C.E. continued to perform fellatio on the Defendant until there was a knock on the door. At that point, the Defendant stopped C.E. "immediately" and began to run, "looking everywhere" for a place to hide. C.E. saw the Defendant go "upstairs through the attic." C.E. then went back to her room and went back to bed.

When the MPD officers discovered that the Defendant was not at his home, they decided to go to his girlfriend's house to see if he was there. The Defendant had been banned from going to his girlfriend's house as a condition of his community supervision because there were allegations that the Defendant "had molested young girls" at the house. However, the Defendant had repeatedly violated that ban in the past. The MPD officers arrived at the Defendant's girlfriend's house at approximately 4:00 a.m. One of the officers approached the front door and noticed that the living room light was on. When the officer knocked on the door, he heard movement inside the house and saw the light in the living room go out. No one answered the door, so the officers surrounded the house and waited.

Eventually, the Defendant's girlfriend answered the door. She told the officer that she had just woken up and that the Defendant was not there. At about the same time, another officer saw the Defendant climb onto the roof of the house and lie down. The officer shined his flashlight on the Defendant and ordered him to put his hands up. The Defendant jumped off the roof and ran from the officers. The officers chased the Defendant and caught him a few blocks away from his girlfriend's house. As he was running, the Defendant dropped a black hoodie matching the one described by the victims. After the Defendant was apprehended, the officers searched him and found a condom, a jar of Vaseline, two cell phones, and a lighter.

The MPD officers recovered a laptop computer belonging to A.C.'s step-mother inside the Defendant's girlfriend's house. Inside the laptop was a pornographic DVD which A.C.'s step-mother stated was not in the laptop when it went missing. When the Defendant was booked into the Gibson County jail, the jailer found a small plastic bag with a small amount of a green leafy substance in the "watch pocket" of the Defendant's pants. The substance field tested positive for marijuana. After the Defendant's arrest, the investigators recalled F.W.'s rape and thought that the details of the offense were similar to what had occurred on the morning of November 7, 2011. F.W. was shown a photographic lineup and picked out the Defendant's picture. F.W also identified the Defendant at trial as the man that raped her.

Probation and Parole Officer Abby Steele testified at the Defendant's trial that she had been assigned to supervise the Defendant's release. Officer Steele testified that, at the time

of F.W.'s rape, the Defendant lived in the same apartment building as F.W. Officer Steele also testified that at approximately 6:00 a.m. on November 4, 2011, the Defendant's GPS unit showed that the Defendant had been on West Woodrow Street. The Defendant then went to North Side Terrace for approximately eleven minutes. Finally, at 6:30 a.m. on November 4, 2011, the Defendant's GPS unit showed that he spent several minutes at A.C.'s address.

Based upon the foregoing evidence, the jury acquitted the Defendant of raping C.E. and the charge of bringing contraband into a penal facility. The jury found the Defendant guilty of the lesser-included offense of aggravated kidnapping with respect to the Defendant's removal of A.C. from her home instead of the charged offense of especially aggravated kidnapping. The jury convicted the Defendant of the remaining charges: two counts of aggravated rape, two counts of especially aggravated kidnapping, four counts of aggravated burglary, aggravated assault, ten counts of felony violation of community supervision conditions, six counts of misdemeanor violation of community supervision conditions, simple possession of marijuana, and indecent exposure.

The trial court sentenced the Defendant to twenty-five years for each conviction of aggravated rape and especially aggravated kidnapping, twelve years for each aggravated kidnapping conviction, six years for each conviction of aggravated burglary and aggravated assault, two years for each conviction of felony violation of community supervision conditions, and eleven months and twenty-nine days for each conviction of misdemeanor violation of community supervision conditions, simple possession of marijuana, and indecent exposure. The trial court ordered that the Defendant's sentences for the aggravated rape of F.W., the aggravated kidnapping of A.C., and the especially aggravated kidnapping of Ms. Randle be served consecutively to one another and all other sentences to be served concurrently, for a total effective sentence of sixty-two years.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that he "could not have possibly have committed" the offenses "in the time frame presented by the proof" and that the victims' testimony was not believable. The State responds that the Defendant has waived our review of this issue by failing to cite any legal authority to support his arguments. The State further responds that the evidence was sufficient to sustain the Defendant's convictions.

The Defendant has failed to provide any citations to legal authority to support his arguments regarding the sufficiency of the evidence, and his arguments with respect to this

issue are limited to several short, conclusory sentences challenging the credibility of the victims. As such, the Defendant has waived review of the issue in this court. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court."). Furthermore, the Defendant's arguments challenge only the weight and credibility of the evidence which were issues for the jury to decide and will not be revisited by this court. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Accordingly, we conclude that this issue has no merit.

## II. Corroboration of Victims' Testimony

The Defendant contends that the two rape victims were actually accomplices to the crimes; therefore, their testimony required corroboration. The Defendant argues that a defendant "indicted for the crime of oral sex may not be convicted on the uncorroborated testimony of an accomplice" and cites to case law dealing with a repealed statute that outlawed "crimes against nature." The State responds that Tennessee law has never required the testimony of a rape victim to be corroborated in order to be sufficient to sustain a conviction.

The Defendant argues that F.W. and A.C.'s testimony required corroboration because he was "indicted for the crime of oral sex." However, there is no "crime of oral sex" in Tennessee, as this state's "crimes against nature" statute was repealed in 1989. Instead, the Defendant was charged and convicted of two counts of aggravated rape. See Tenn. Code Ann. §§ 39-13-501, -502 (defining aggravated rape as an "unlawful sexual penetration of a victim by the defendant," including fellatio, accomplished by force or coercion and while the defendant is armed with a weapon or an object "used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon"). "Tennessee courts have long held that both minor and adult victims of forcible or coercive sex offenses, such as simple rape, do not qualify as accomplices and are not subject to any corroboration requirement." State v. Collier, 411 S.W.3d 886, 896 n.8 (Tenn. 2013). Accordingly, we conclude that this issue is devoid of any merit.

## III. Reopening of State's Proof

During defense counsel's cross-examination of Officer Steele, she was asked if the Defendant had ever been administered a polygraph test and if the Defendant had "pass[ed] it." Officer Steele responded that the Defendant had passed a polygraph test. The State then rested its proof. A short time after Officer Steele left the stand, the trial court allowed the State to reopen its proof and briefly recall Officer Steele. Officer Steele testified that the polygraph test administered to the Defendant had nothing to do with the offenses the Defendant was on trial for. On appeal, the Defendant contends that the trial court erred by

allowing the State to recall Officer Steele. The State responds that the Defendant has waived our review of this issue by failing to cite any legal authority to support his argument. The State further responds that the Defendant has failed to show that the trial court's decision amounted to an injustice.

The Defendant has failed to provide any citations to legal authority to support his argument regarding this issue and his argument is limited to a single conclusory sentence that he was prejudiced by the trial court's decision. As such, the Defendant has waived review of the issue in this court. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court."). Furthermore, there is nothing in the record to show "that an injustice had been done" by the trial court's decision to allow the State to reopen its proof. State v. Brock, 940 S.W.2d 577, 580 (Tenn. Crim. App. 1996). Accordingly, we conclude that this issue is without merit.

*IV. State's Rebuttal Argument*

The Defendant contends that the State raised issues in its rebuttal argument that had not been raised in the Defendant's closing argument. The Defendant argues that the State was allowed to discuss his jumping off the roof of his girlfriend's house and running from the police during its rebuttal argument when defense counsel had not addressed that issue in his closing argument. The Defendant further argues that the State was allowed to mention that there were "procedures" he could have used to prevent so many charges from being heard in a single trial. The State responds that both of these issues were raised in its original closing argument and the Defendant's closing argument.

In discussing C.E.'s testimony during the State's initial closing argument, the prosecutor stated that, when the Defendant heard a knock on the door of his girlfriend's house, he "seemed to know that it was the police" and that he "attempted to escape the police out the attic." During the rebuttal argument, the prosecutor stated that the Defendant "was found at [his girlfriend's] home and jumped off the roof at her home." Defense counsel then objected to any mention of "the roof" because he had not said anything about it during his closing argument. During defense counsel's closing argument, he made several statements that the State had "over charged" the Defendant in the hope that bringing so many charges at once it would convince the jury "to convict him of something." During the State's rebuttal argument, the prosecutor argued that there were "procedures" that the Defendant could have employed to prevent so many charges from being heard in a single trial. Defense counsel objected to the State's mention of "procedures."

The argument of counsel "is a valuable privilege that should not be unduly restricted." Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975). Accordingly, "[a]ttorneys have great

leeway in arguing before a jury, and the trial court's broad discretion in controlling their arguments will be reversed only upon an abuse of discretion." State v. Scarborough, 300 S.W.3d 717, 731 (Tenn. Crim. App. 2009) (citing Terry v. State, 46 S.W.3d 147, 156 (Tenn. 2001)). Tennessee Rule of Criminal Procedure 29.1(c) provides that the state is allowed "a final closing argument following the defendant's closing argument" and that this argument "is limited to the subject matter covered in the state's first closing argument and the defendant's intervening argument." Here, the State clearly raised the issue of the Defendant's fleeing his girlfriend's house from the attic and running from the police during its initial closing argument. Likewise, defense counsel made several statements during his closing argument that the Defendant had been "over charged." Accordingly, we conclude that the trial court did not abuse its discretion when it allowed the State to make the challenged comments during its rebuttal argument.

*V. Sentencing*

The Defendant contends that he "was sentenced improperly." The following statement is the Defendant's entire argument with respect to this issue: "The [t]rial [j]udge sentenced the Defendant to violating community supervision as two (2) years in each or twenty (20) years instead of sentencing on [t]hree (3) violations." The State responds that the Defendant has waived our review of this issue by failing "to make a coherent argument" or to cite to any legal authority to support his argument.

We agree with the State that the Defendant has failed "to make a coherent argument" with respect to this issue and has failed to cite any legal authority to support his argument. As such, the Defendant has waived review of the issue in this court. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument [or] citation to authorities . . . will be treated as waived in this court."). Accordingly, we conclude that this issue has no merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE